IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | |
|---|---|
| B.A.P., a minor child by and through her parent, Richard Penkoski; and Richard Penkoski, as the parent and legal guardian of B.A.P.,<br><br>Plaintiffs,<br><br>- against -<br><br>OVERTON COUNTY BOARD OF EDUCATION; RICHARD MELTON; and STEPHEN HENSON,<br><br>Defendants. | Case No.: 2:20−cv−00065<br><br>Judge Waverly D. Crenshaw, Jr.<br><br>Magistrate Judge Alistair Newbern |

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS MELTON'S AND HENSON'S MOTION TO DISMISS

Plaintiffs, B.A.P. and Richard Penkoski, by and through undersigned counsel, hereby file their Memorandum in Opposition to Defendants Melton and Henson's Motion to Dismiss (Doc. 52) (the "Motion").

## I.  MOTION TO DISMISS STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "The standard for reviewing a Fed.R.Civ.P. 12(b)(6) dismissal is that the factual allegations in the complaint must be regarded as true, and 'the claim should not be dismissed unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *AMC Mortgage Co., Inc. v. Resolution Trust Corp.*, 846 F. Supp. 1323, 1328

(M.D. Tenn. 1994) (quoting *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir.1988)).

## II.     PLAINTIFFS' CLAIMS AGAINST HENSON SHOULD NOT BE DISMISSED

### A.     Plaintiffs Have Stated Claims for Relief Against Henson

In their Memorandum in Support of Motion to Dismiss (the "Memo"), Defendants argue that Plaintiffs have made no connection between the content of Plaintiff B.A.P.'s shirt and the actions taken against her. (Memo at 5-6). On the contrary, in ¶¶ 16 and 59 of Plaintiffs' First Amended Complaint (Doc. 43) (the "Complaint"), Plaintiffs allege: "At all material times, STEPHEN HENSON has demanded that Plaintiff B.A.P. not wear the shirt deemed in violation of the OVERTON COUNTY BOARD OF EDUCATION's policies and Livingston Academy's 2020-2021 student handbook to school again." Defendants attempt to explain away these allegations by asserting that, because they are not included in the Complaint's description of what happened in the classroom, they are either "naked assertions" in violation of *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007), or "conclusory assumptions" in violation of *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). (Memo at 6).

Neither *Twombly* nor *Iqbal* hold that allegations that otherwise satisfy the federal pleading standard must be located in the correct section of the complaint. Defendants provide no authority, and Plaintiffs are aware of none, that permits courts to disregard factual allegations in a complaint based upon the section in which they appear. Indeed, the above-quoted allegations appear twice, under the headings "PARTIES" (¶ 16) and "FACTS" (¶ 59). They are both "repeated and alleged in full force and effect" under the substantive claims: Count I, for violation of the Free Speech Clause (¶ 137); Count II, for violation of the Free Exercise Clause (¶ 155); Count III, for violation of the Due Process Clause (¶ 178); and Count IV, for violation of the

2

Equal Protection Clause (¶ 196). Notably, the allegations in ¶¶ 16 and 59 are neither "naked assertions" nor "conclusory assumptions"; rather, they are well-pled factual allegations.

Defendants state that Plaintiffs have not alleged that Henson had any authority other than to send B.A.P. to the principal's office. That is false. Plaintiffs allege, in ¶ 16:

> At all material times, Defendant, STEPHEN HENSON, had the right, power, privilege, and authority to interpret, enforce, and apply the OVERTON COUNTY BOARD OF EDUCATION's policies and Livingston Academy's 2020-2021 student handbook and other Livingston Academy regulations and to do and perform all of the acts pertaining to the affairs at Livingston Academy.

They allege further: "At all material times, STEPHEN HENSON has had full knowledge of the enforcement of the OVERTON COUNTY BOARD OF EDUCATION's policies and Livingston Academy's 2020-2021 student handbook alleged herein and has had the power and authority to remedy the interpretation, enforcement, and application, but failed to do so." *Id.*

Defendants contend that "[i]t is far more plausible that Mr. Henson was unmindful of whatever message the minor Plaintiff was attempting to convey and was, instead, simply enforcing the facially neutral dress code Plaintiffs reference in their Amended Complaint." (Memo at 6). In fact, it is decidedly implausible that Henson, or anyone else, could be unaware of the message being conveyed by "'homosexuality is a sin - 1 Corinthians 6:9-10.'" (Complaint at ¶ 63). Further, Defendants do not explain how Henson could have been applying the dress code without reading B.A.P.'s shirt (the only way he could have been "unmindful of the message") – there is no argument that it violated any of the content-neutral provisions of the dress code, such as by being a tube top. The allegations in the Complaint clearly demonstrate that the problem with B.A.P.'s shirt is that the language was considered "sexually connotative," a clear reference to the content. (Complaint at ¶ 73). While this allegation names Defendant Melton, it is highly implausible that Henson sent B.A.P. to the principal's office because of her

3

shirt, and told her not to wear her shirt again, based on a completely different, and content-neutral, issue with the shirt than the content-specific issue Melton had with it.

Defendants take issue with Plaintiffs' characterization of a poster in Henson's classroom as a "pro-homosexual symbol." (Memo at 6-7). First, Plaintiffs attach a copy of the poster to the Complaint as Exhibit 1. (Doc. 43-1). To argue that it is not a "pro-homosexual symbol" is a dispute of fact. Plaintiffs have alleged that the poster is pro-homosexual, which, for purposes of Rule 12(b)(6), must be accepted as true. Defendants may dispute that interpretation later, but not in a motion to dismiss. Second, the poster contains the words "Diverse," "Inclusive," "Accepting," "Welcoming," and "Safe Space for Everyone," in the colors of the rainbow. (*See* Doc. 43-1; Complaint at ¶ 65).

Even if this Court were permitted to evaluate the facts in addressing a motion to dismiss, any reasonable viewer would interpret the poster as being pro-homosexual, and inconsistent with the message of B.A.P.'s shirt that "homosexuality is a sin." Defendants are in the position of arguing that it is not apparent that the poster, produced by True Colors Fund[1], does not convey

---

[1] A link to the website www.TrueColorsFund.org appears at the bottom of the poster, which is attached to and part of the Complaint. In addition, the Complaint quotes from the website. (Complaint at ¶ 67). The link that is part of the exhibit to the Complaint is to the website for True Colors United. A visit to this site makes it obvious, without leaving the homepage, that True Colors United is a pro-homosexual organization. The homepage includes, towards the top and in large letters, the sentence "True Colors United implements innovative solutions to youth homelessness that focus on the unique experiences of LGBTQ young people." The next section of the homepage is "Latest Stories." The first of the four news stories visible on the homepage is a story about the murder of a "young Black trans man." Below this section is an invitation for readers to "Start your own campaign," which is described: "Launch a fundraising campaign to support lesbian, gay, bisexual, transgender, queer, and questioning (LGBTQ) youth experiencing homelessness." Below that, the bottom section of the homepage, is the following sentence above a "Donate" button: "True Colors United implements innovative solutions to youth homelessness that focus on the unique experiences of LGBTQ young people." On the other side of this section appears the poster from Henson's classroom, with the following sentence below: "Create a welcoming environment for LGBTQ youth by using visual cues like safe space stickers, all

4

an obviously pro-homosexual message. Defendants are similarly hard-pressed to argue that the message of B.A.P.'s shirt is not in diametric opposition to the message posted in Henson's classroom. At any rate, again, all of this factual interpretation is impermissible on a motion to dismiss.

Defendants argue that, even if the poster is pro-homosexual, "that fact would not support the conclusion that Mr. Henson violated Plaintiffs' rights." (Memo at 7). However, for purposes of Rule 12(b)(6), the important consideration is that the reverse is true: even if the poster is **not** pro-homosexual, that fact does not render legally insufficient the allegations of the Complaint that B.A.P.'s constitutional rights were violated based upon the content of the message on her clothing. A finder of fact is free to discount the weight or persuasiveness of the poster in the classroom, but such a determination is impermissible on a motion to dismiss.

Defendants go on to argue that "it is far more plausible that the poster merely advertised the Board of Education's commitment to offer students a safe, welcoming environment consistent with Tennessee law and Board Policy No. 6.304 . . . ." (Memo at 7). Defendants contend that the words in the poster "demonstrate a message of unconditional acceptance and inclusion." (*Id.*). The point is the message on B.A.P.'s shirt is inconsistent with the Board's "commitment" and the message of the poster to the extent it includes homosexuality. Defendants do not, and cannot, dispute that, even if a factual dispute were permissible in a motion to dismiss (which it is not).

It is noteworthy that Defendants argue that the poster's words "demonstrate a message of unconditional acceptance and inclusion." (*Id.*). Such acceptance and inclusion clearly includes

---

gender restroom signs, and pronoun buttons. Browse our online shop to find the perfect items for your space!"

5

members of the LGBTQ community. Yet, as interpreted by Defendants, the dress code prohibits clothing that references any of the words for which "LGBTQ" stands, as sexually connotative. Defendants cannot use a policy of inclusion to justify a dress code that prohibits any reference to the groups covered by the policy of inclusion; unless, of course, the dress code prohibits only references that are critical of any of the covered groups, which constitutes viewpoint exclusion.

### B. Henson is not Entitled to Dismissal Based on Qualified Immunity

Defendants argue that, even if Plaintiffs have alleged a constitutional violation, Henson is entitled to qualified immunity because Plaintiffs have not demonstrated a clearly-established right. (Memo at 8ff). First, this argument is under the heading "All Claims Against Stephen Henson Should be Dismissed." However, the defense of qualified immunity applies only to claims for damages. Plaintiffs seek both injunctive and declaratory relief, which are not barred by qualified immunity. *Manion v. Evans*, 986 F.2d 1036, 1041 n.2 (6th Cir. 1993) ("there is no qualified immunity from declaratory or injunctive actions").

Second, the Sixth Circuit has "cautioned that 'it is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity.'" *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016) (quoting *Wesley v. Campbell*, 779 F.3d 421, 433 (6th Cir. 2015)). The Court clarified: "'Although an officer's entitlement to qualified immunity is a threshold question to be resolved at the earliest possible point, that point is usually summary judgment and not dismissal under Rule 12." *Id.* (quoting *Wesley*, 779 F.3d at 433–34 (internal marks and citations omitted in original)). This is underscored by the fact that, throughout their Memo, Defendants argue for "more plausible" factual conclusions than those alleged in the Complaint. These alternative facts are to be explored in discovery. Defendants

cannot rely upon facts outside the four corners of the Complaint to argue that the case should be dismissed before Plaintiffs have the opportunity to explore those facts in discovery.

Defendants claim that Plaintiffs' constitutional rights were not clearly established at the time of Henson's violation. (Memo at 8ff). In fact, Plaintiffs set forth the clearly-established law in their Complaint. Plaintiffs cite this Court's case, *Young v. Giles County Bd. of Educ.*, 181 F.Supp.3d 459 (M.D. Tenn. 2015), and *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969), a Supreme Court case. *Young* involved a high school student who wore to school a shirt that read "Some People Are Gay, Get Over It." 181 F.Supp.3d at 461. The principal informed her that she could not wear the shirt "or 'any other shirt referencing LGBT rights.'" *Id.* at 462. The county director of schools, also a defendant, stated that "'pro-LGBT messages are sexual in nature and, therefore, prohibited by the dress code.'" *Id.* The defendants later justified the ban by stating that attire that is disruptive or risky to health or safety is not appropriate. *Id.*

This Court held that a school may not "punish 'silent, passive expression of opinion, unaccompanied by any disorder or disturbance' attributable to such expression, and 'undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression.'" *Id.* at 463 (quoting *Tinker*, 393 U.S. at 508). This Court quoted the *Tinker* test for regulating student speech on issues of political importance:

> 'In order for the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint. Certainly where there is no finding and no showing that engaging in the forbidden conduct would "materially and substantially interfere with the requirements of appropriate discipline in the operation of the school," the prohibition cannot be sustained.'

*Id.* (quoting *Tinker*, 393 U.S. at 509). This Court held further: "Student expression on LGBT issues is speech on a purely political topic, which falls clearly within the ambit of the First

7

Amendment's protection." *Id.* at 464. Notably, the defendants in *Young*, like Defendants here, tried to hide behind a facially neutral dress code to justify their censorship. *See id.* at 462.[2] This Court was not persuaded, and granted a preliminary injunction to the plaintiff. *Id.* at 465. Both *Young* and *Tinker* were clearly established at the time of the violations in this case.

Defendants attempt to distinguish *Young* and *Tinker* by arguing that "the school districts in those cases specifically targeted the plaintiffs' messages rather than relying upon a previously adopted, facially neutral dress code." (Memo at 13). However, as noted above and in footnote 2, the defendants in *Young* attempted to rely upon the same type of "facially neutral" policies Defendants cite here. This Court was not persuaded. Defendants claim that a statement by one of the school defendants in *Young* that "'pro-LGBT messages are sexual in nature'" was an *ex post facto* argument that could not be considered because the initial reason given for the ban was that shirts referencing LGBT rights were not allowed. (Memo at 14). However, nowhere in *Young* did this Court make that distinction, nor did this Court state that it would not consider the "sexual in nature" argument. At any rate, the alleged "*ex post facto*" explanation is perfectly consistent with the initial reason: (1) shirts referencing LGBT rights are not allowed because (2) they are sexual in nature. Defendants simply attempt to discount the "sexual in nature" justification for the ban in *Young* because it is the same as the "sexually connotative" justification given in this case.

---

[2] The defendants cited a policy that stated "that '[i]n order to maintain an atmosphere conducive to learning and to prepare students for working environment [sic], the Giles County School System requires that all students, grades K-12, exercise good taste with regard to their personal appearance. Attire considered disruptive or risky to health or school/personal safety is not appropriate.'" *Id.* (internal citation omitted). The defendants cited "[a]nother policy [which] provide[d] that '[w]hen a student is attired in a manner which is likely to cause disruption or interference with the operation of the school, the principal shall administer appropriate punishment, which may include suspension and/or expulsion.'" *Id.* (internal citation omitted). The defendants stated "their 'intent to protect all students interest [sic] but not at the expense of student's [sic] safety and their learning environment.'" *Id.* (internal citation omitted). These policies are similar in substance to the "facially neutral" policies Defendants rely upon here.

8

Defendants argue that, in *Tinker*, the policy "was adopted with the intention of banning the precise speech the plaintiffs in that case later exhibited . . . ." (Memo at 13). However, the claims against Henson and Melton are as-applied claims; as to those claims, it is irrelevant whether the policy was specifically intended to apply to Plaintiffs' speech or not; the allegations are that Henson and Melton violated Plaintiffs' constitutional rights by applying the policies as they did.

Defendants quote *Barr v. Lafon*, 538 F.3d 554, 567-68 (6th Cir. 2008), for the unremarkable principle that "'First Amendment standards applicable to student speech in public school . . . are unique, and courts accord more weight in the school setting to the educational authority of the school in attending to all students' psychological and developmental needs.'" (Memo at 9). This Court in *Young* and the Supreme Court in *Tinker* both recognized this principle, and yet ruled for the plaintiff. Defendants cite *Blau v. Fort Thomas Public School Dist.*, 401 F.3d 381, 387 (6th Cir. 2005), in which the Sixth Circuit "upheld a dress code that prohibited, among other things, '[c]lothing that promotes drugs, alcohol, tobacco, sex, or is offensive or degrading.'" (Memo at 9). Clearly, "promot[ing] . . . sex" is a far cry from making statements regarding LGBTQ issues, which the plaintiff in *Young* did, and which Plaintiffs here do. This Court held that "Student expression on LGBT issues is speech on a purely political topic, which falls clearly within the ambit of the First Amendment's protection." *Young*, 181 F.Supp.3d at 464. Speech promoting sex, which the dress code in *Blau* banned, is not "speech on a purely political topic."

Defendants state that the instant dress code prohibits clothing with "sexual connotations," which they justify because "school officials across the country rationally prohibit clothing that classmates might find titillating, amusing, or distracting . . . ." (Memo at 10). First, this statement

9

relies upon facts outside the Complaint. Plaintiffs' allegations cannot be fact-checked under Rule 12(b)(6). Further, banning B.A.P.'s shirt under that standard because the word "homosexuality" connotes sex is the same as the defendants in *Young* unconstitutionally banning the shirt that contained the word "gay." However these Defendants may try to cast their conduct as "facially neutral" in an attempt to protect the school's learning environment from disruption, as the defendants in *Young* did, the fact is they have used the dress code to shut down Plaintiffs' speech on an important political topic, as this Court ruled unconstitutional in *Young*.

With respect to the student telling a story, in Henson's presence, about two others having sex, Henson states: "Plaintiffs surely do not contend that the dress code, to be applied fairly, should prohibit the use of the spoken word 'sex,' whether uttered in biology class, English grammar classes, or on the playground." (Memo at 10). Defendants have missed the point. Plaintiffs do not allege that the conversation about people having sex violated the dress code; the point is that Henson has no problem with a student discussing, verbally, two people having sex, but then prohibits B.A.P. from wearing a shirt that makes a political, social, and religious statement, based upon the dress code.

Defendants attempt to justify their censorship by referencing the School Board's policy against "bullying, intimidation, and harassment." (Memo at 10-12). Not surprisingly, the defendants in *Young* also attempted to justify their censorship by arguing that it was necessary to protect against "bullying or harassment." 181 F.Supp.3d at 462 (internal citation and quotation marks omitted). Again, this Court was not persuaded in *Young*, and should not be here.

Defendants cite *Boroff v. Van Wert City Bd. of Educ.*, 220 F.3d 465 (6th Cir. 2000), for the proposition that "schools may prohibit speech that is 'inconsistent with and counter-productive to education.'" (Memo at 12). In that case, the plaintiff student was prohibited from

wearing t-shirts depicting the rock band Marilyn Manson. *Boroff*, 220 F.3d at 467. The principal

of the school found the t-shirts offensive because "the band promotes destructive conduct and

demoralizing values that are contrary to the educational mission of the school." *Id.* at 469. As an

example, the principal believed a shirt that included a three-headed Jesus was offensive because

it mocked a religious figure. *Id.* As further support for his decision, the principal quoted the

following lyrics from Marilyn Manson songs as being offensive: "'you can kill yourself now

because you're dead in my mind,' 'let's jump upon the sharp swords/and cut away our

smiles/without the threat of death/there's no reason to live at all,' and 'Let's just kill everyone

and let your god sort them out/F--- it/Everybody's someone else's n----r/I know you are so am I/I

wasn't born with enough middle fingers.'" *Id.* at 470. The principal cited magazine articles that

depicted Manson as having a "'pro-drug persona'" and admitting that he uses drugs. *Id.*

The messages conveyed by Marilyn Manson t-shirts are not remotely close to B.A.P.'s

shirt, which quotes the Bible. In finding no constitutional violation, the *Boroff* Court held that

"[t]he standard for reviewing the suppression of vulgar or plainly offensive speech is governed

by [*Bethel School Dist. No. 403 v. Fraser*, 478 U.S. 675 (1986)]." *Id.* at 469. The *Boroff* Court

noted that *Fraser* "distinguished *Tinker* because the vulgar and offensive speech at issue was

'unrelated to any political viewpoint.'" *Id.* at 468 (quoting *Fraser*, 478 U.S. at 685). This Court

has already ruled that "[s]tudent expression on LGBT issues is speech on a purely political topic,

which falls clearly within the ambit of the First Amendment's protection." *Young*, 181 F.Supp.3d

at 464.

Defendants make the following argument: "Here, there is no allegation in the Amended

Complaint that Mr. Henson told the minor Plaintiff that she could not wear the shirt at issue

because it contained a message about homosexuality. Rather, the shirt was unacceptable because

11

it contained something inarguably and plainly listed as prohibited in the dress code." (Memo at 14). While Henson may not have used the exact language "you cannot wear that shirt because it contains a message about homosexuality," the fact is he prohibited her from wearing her shirt because of its content, which is self-explanatory. "Homosexuality is a sin" requires no interpretation. Melton later affirmed Henson's decision because the shirt was "sexually connotative." Henson cannot get around the law by attempting to hide the ball. He told B.A.P. she could not wear her shirt because of what it said, which is protected speech, as this Court held in *Young*. The argument that "the shirt was unacceptable because it contained something inarguably and plainly listed as prohibited in the dress code" simply furthers Plaintiffs' claims. Plaintiffs' protected political, social, and religious message is prohibited by the policies. Plaintiffs made that very allegation in the Complaint at ¶ 117. (*See also* ¶¶ 139, 141, 159, 162, 164, 181, 199).

Defendant Henson is not entitled to qualified immunity because he violated Plaintiffs' constitutional rights, and those rights were clearly established at the time of the violation in both *Young* and *Tinker*. Further, it is improper to consider Henson's qualified immunity defense on a motion to dismiss, particularly when he relies upon facts, outside the Complaint, that must be fleshed out in discovery.

## III.    PLAINTIFFS' CLAIMS AGAINST MELTON SHOULD NOT BE DISMISSED

### A.    The Complaint States Valid Claims Against Melton

#### 1.    The First Amended Complaint Sets Forth Well-Pled Allegations for Failure to Train

Defendants argue that the Complaint does not set forth sufficient factual support for Plaintiffs' failure to train claims. (Memo at 15). This argument fails. Paragraph 9 of the Complaint alleges:

Plaintiff challenges the OVERTON COUNTY BOARD OF EDUCATION's and MELTON's policy, practice, or custom for training others to interpret, enforce, and apply the Policy, and alleges that the training and/or instruction is either erroneous or lacking in proper instruction to avoid violations of Plaintiffs' constitutional rights. The OVERTON COUNTY BOARD OF EDUCATION's and MELTON's policy, practice, or custom for training others to interpret, enforce, and apply the Policy exhibits deliberate indifference to Plaintiffs' rights.

(Complaint at ¶ 9). The Complaint makes the following allegations:

The OVERTON COUNTY BOARD OF EDUCATION and RICHARD MELTON had a duty at all times mentioned herein to implement and enforce policies and procedures to adequately supervise and adequately train others so as to prevent the constitutional violations.

The OVERTON COUNTY BOARD OF EDUCATION and RICHARD MELTON failed to implement and enforce policies and procedures to adequately supervise and adequately train others so as to prevent the constitutional violations.

The OVERTON COUNTY BOARD OF EDUCATION'S and RICHARD MELTON's actions and omissions regarding the failure to adequately train others so as to prevent the constitutional violations alleged herein exhibit deliberate indifference toward Plaintiff B.A.P.'s rights to freedom of speech and the free exercise of religion protected under the United States Constitution.

(Complaint at ¶¶ 132-134).

Contrary to Defendants' assertion, the constitutional violations resulting from Melton's failure to train are not "unspecified." (Memo at 15). The Complaint clearly alleges violations of Plaintiffs' First and Fourteenth Amendment rights. The Complaint threads the needle between the violations and the consequences:

The enforcement of OVERTON COUNTY BOARD OF EDUCATION's policies, custom, practice, or procedure and Livingston Academy's 2020-2021 student handbook, and failure to adequately supervise and adequately train others, unconstitutionally impose a burden on Plaintiff B.A.P.'s and other individuals' constitutional rights because they:

a. allow for the exercise of unbridled discretion; and,

b. are so vague they lack common meaning or understanding; and,

13

c. lack narrow tailoring, fail to achieve any legitimate government purpose, and fail to leave open alternative avenues for expression.

The *Twombly* Court itself stated that it did "not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." 550 U.S. at 570. While Defendants effectively ask this Court to require "heightened fact pleading of specifics," the Supreme Court precedent explicitly does not require such heightened pleading. Plaintiffs' Complaint has stated a claim against Melton for failure to train.

**B.      Plaintiffs' Have Stated a Valid Claim for Relief Related to the Student Handbook**

Defendants offer three sentences in argument that Plaintiffs' claims related to the Student Handbook should be dismissed. (Memo at 16). They claim that Plaintiffs have not alleged how Melton's drafting and enforcement of the handbook impacted Plaintiffs' constitutional rights. (*Id.*). Paragraphs 15 and 58 of the Complaint allege:

> At all material times, RICHARD MELTON agreed with, has ratified, and approved of the enforcement of the OVERTON COUNTY BOARD OF EDUCATION's policies and Livingston Academy's 2020-2021 student handbook on August 25, 2020. At all material times, RICHARD MELTON has demanded that Plaintiff B.A.P. not wear the shirt deemed in violation of the OVERTON COUNTY BOARD OF EDUCATION's policies and Livingston Academy's 2020-2021 student handbook to school again. At all material times, RICHARD MELTON, by both his acts and failure to act, has ratified the unlawful interpretation, enforcement, and application of the OVERTON COUNTY BOARD OF EDUCATION's policies and Livingston Academy's 2020-2021 student handbook.

This paragraph clearly alleges that Melton ratified and approved of the enforcement of the handbook, and enforced the handbook himself by demanding that B.A.P. not wear her shirt to school again. The paragraph further alleges that Melton's conduct ratified the unlawful enforcement of the handbook. The Complaint alleges that, as a result of the unlawful enforcement of the handbook, "Plaintiff B.A.P. is unsure of her ability to exercise her

14

constitutionally protected activities, and fears retaliation, suspension and/or expulsion."
(Complaint at ¶ 35). The Complaint then alleges, in detail, Melton's interpretation and
enforcement of the handbook. (*Id.* at ¶¶ 72-99). Paragraphs 100 through 107 of the Complaint set
forth the consequences directly related to Defendants', including Melton's, conduct. The
constitutional violations and their consequences are further set forth in ¶¶ 110-134.

While the subheading for the section of Defendants' Memo setting forth this argument
refers to unconstitutional vagueness, the body of the argument makes no mention of vagueness.
To the extent this argument is read to challenge Plaintiffs' void for vagueness argument, it must
be noted that such argument is a facial challenge to the handbook. Thus, he cannot seek dismissal
of that claim.

### C. Plaintiffs Have Stated a Valid Claim for Violations of the First Amendment

Defendants again argue that Plaintiffs failed to state facts sufficient to state a claim, this
time for viewpoint discrimination. (Memo at 16-18). Defendants' argument contains multiple
erroneous legal conclusions. First, Defendants seem to conclude that, because B.A.P.'s shirt
(allegedly) violated the dress code, there is no constitutional violation. However, finding that
B.A.P.'s shirt violated the dress code because of its political, social, and religious message is
unconstitutional. Contrary to Defendants' argument, the Complaint does not "offer[] a more
plausible, legitimate basis for what Mr. Melton did: the minor Plaintiff's shirt was in violation of
the dress code. It contained a sexual connotation, which is prohibited." (Memo at 16). Plaintiffs
have alleged that Melton *told them* that the shirt contained a sexual connotation because the word
"homosexual" includes the letters for "sex." (Complaint at ¶¶ 88-89). Plaintiffs then allege: "As
interpreted an[d] applied, any message on clothing where the letters combine to the word "sex" is
prohibited." (*Id.* at ¶¶ 141, 164). The Complaint then alleges that, incongruently, the word "sex"

is not prohibited from being spoken. (*Id.* at ¶¶ 142-143; 165-166). The Complaint makes the same allegations with respect to the word "homosexual." (*Id.* at ¶¶ 144-146; 167-169). Far from setting forth a "plausible, legitimate basis" for Melton's actions, the Complaint alleges that this interpretation and enforcement of the dress code violates the Constitution. (*Id.* at ¶¶ 147-154; 170-177).

Defendants' conclusion that B.A.P.'s shirt violated the dress code does not make their conduct constitutional. On the contrary, prohibiting B.A.P.'s protected speech under the dress code was unconstitutional. Applying an unconstitutional dress code is unconstitutional, and applying the dress code in an unconstitutional manner is unconstitutional. Plaintiffs have alleged both. For Defendants to argue that the protected political message of B.A.P.'s shirt violated the dress code simply furthers Plaintiffs' claims. Further, the Complaint alleges that Defendants singled out B.A.P. while other students were allowed to discuss "sex" with teachers in the classroom (¶ 90) and to wear clothing that appeared to violate the same dress code (¶ 109). These are allegations of viewpoint discrimination, which is unconstitutional.

Defendants argue: "Plaintiffs do not represent that Mr. Melton ever referenced the minor Plaintiff's religion or religious viewpoint at any point on August 25, 2020 . . . ." (Memo at 16). If Defendants are arguing that, in order to violate Plaintiffs' constitutional rights, he must explicitly reference their religious viewpoint, their argument fails. The Complaint alleges that B.A.P. wore a shirt with a religious message, she was removed from school based upon that message, while a contrary message on a poster hung in the classroom, and while other students wearing clothing that arguably violated the same dress code suffered no consequences. These allegations set forth a viable claim for a First Amendment violation.

16

Defendants assert that Plaintiffs "make no allegation that Mr. Melton prevented the minor Plaintiff from expressing a religious viewpoint in a manner that did not violate the dress code." (Memo at 17). This, too, is an ineffective challenge to Plaintiffs' well-pled claims. First, it is based upon Defendants' erroneous assumption, addressed above, that the dress code is inviolate, and no enforcement of it can be unconstitutional. Second, the Supreme Court has held that "one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Schneider v. State of New Jersey*, 308 U.S. 147, 163 (1939). If the dress code and/or its application is unconstitutional, it does not matter that B.A.P. had the opportunity to share her message in other ways. Defendants further attempt to justify their conduct: "As principal of the school, Mr. Melton has a responsibility to try to ensure that all students follow the dress code and to take appropriate action when a student is found to be in violation." (Memo at 17). Again, if the dress code itself is unconstitutional, or is being enforced in an unconstitutional manner, Melton's conduct is not beyond constitutional challenge.

In *Parks v. City of Columbus*, 395 F.3d 643, 646 (6th Cir. 2005), the plaintiff was removed from a public festival for distributing literature. The Sixth Circuit held that this removal was based upon the viewpoint of the plaintiff's message.

> There is no evidence that the Arts Council had a blanket prohibition on the distribution of literature **or that others engaging in similar constitutionally protected activity were removed from the permitted area**. While the district court did not reach the question of whether the removal of Parks was based on the content of his speech, under these circumstances **we find it difficult to conceive that Parks's removal was based on something other than the content of his speech**. We therefore must determine whether the City's action regulating Parks's speech was 'necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end.'

*Id.* at 647 (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983)) (emphasis added).

17

Similarly, here, while Plaintiffs were told that B.A.P.'s shirt was prohibited by the dress code because it was "sexually connotative," Plaintiffs have alleged numerous other instances of apparent dress code violations that were not addressed. (Complaint at ¶ 109). In addition, while Plaintiffs were told that B.A.P.'s shirt was prohibited by the dress code because it contained the word "homosexual" which contains the word "sex," B.A.P.'s classroom featured a poster that unmistakably champions LGBT rights. Defendants certainly cannot be arguing that students, and teachers, may champion the rights of homosexuals in school, but B.A.P. cannot wear a shirt because it includes the word "homosexuality." Further, the word "sex" is allowed to be spoken, as set forth in the Complaint. Again, it is not plausible that the dress code proscribes the wearing of a shirt that contains the letters "sex," while students may freely discuss "sex" with teachers in the classroom. Plaintiffs have more than plausibly alleged that B.A.P.'s shirt was banned because of its viewpoint.

### D. Melton is not Entitled to Dismissal Based on Qualified Immunity

Melton argues, for the same reasons as Henson, that the claims against him should be dismissed based on qualified immunity. (Memo at 18-19). For the reasons set forth above, this argument fails.

Defendants argue that the dress code "is strikingly similar to the one the Sixth Circuit upheld in *Blau*." (Memo at 18). On the contrary, as discussed above, the dress code in *Blau* prohibited, as Defendants themselves set forth, "clothing that **promotes** . . . sex." 401 F.3d at 387 (emphasis added). Prohibiting the **promotion** of sex is a far cry from prohibiting a shirt bearing a Scripture quotation on the subject of homosexuality, particularly when that shirt is worn in a classroom featuring a plainly pro-homosexual poster, and in which students are

18

allowed to freely discuss others' sexual conduct with teachers (and where such discussions prompt laughter by the teachers; *see* Complaint at ¶ 90).

Defendants argue: "To the extent that other students may have worn clothing out of compliance with the dress code, the Plaintiffs do not allege that Mr. Melton was aware of any such infractions and turned a blind eye." (Memo at 19). This statement is in direct contradiction of their prior assertion that "[a]s principal of the school, Mr. Melton has a responsibility to try to ensure that all students follow the dress code and to take appropriate action when a student is found to be in violation." (Memo at 17). Unless Defendants are conceding that Melton has neglected his responsibility, it is not unreasonable to infer that Melton, as principal, was aware of the numerous apparent dress code infractions that he is admittedly responsible to address.

As set forth above, the law was clearly established in August 2020 that prohibiting student clothing based upon its political and/or religious content violates the Constitution.

## IV. PLAINTIFFS' DUE PROCESS CLAIM SHOULD NOT BE DISMISSED

Defendants argue: "As the First Amendment directly addresses Plaintiffs' allegations, their due process claim should be dismissed." (Memo at 20). Defendants cite *Boroff* and *Conn v. Gabbert*, 526 U.S. 286 (1999), for the proposition: "'We have held that where another provision of the Constitution provides an explicit textual source of constitutional protection, a court must assess a plaintiff's claims under that explicit provision and not the more generalized notion of substantive due process.'" (*Id.*).

The source of that legal principle is *Graham v Connor*, 490 U.S. 386 (1989), cited by *Conn*. The *Graham* Court was addressing a specific problem:

> the vast majority of lower federal courts have applied its four-part 'substantive due process' test indiscriminately to all excessive force claims lodged against law enforcement and prison officials under § 1983, without considering whether the

19

particular application of force might implicate a more specific constitutional right governed by a different standard.

490 U.S. at 393. The Court noted further that "many courts have seemed to assume, as did the courts below in this case, that there is a generic 'right' to be free from excessive force, grounded not in any particular constitutional provision but rather in 'basic principles of § 1983 jurisprudence.'" *Id.* The Court then held that excessive force claims were to be governed by the Fourth Amendment standard, "rather than to some generalized 'excessive force' standard." *Id.* at 394.

Here, Plaintiffs' Fourteenth Amendment claims do not ask the Court to abrogate the well-settled First Amendment analysis by appealing to some amorphous "substantive due process" right. In fact, both Counts III and IV allege, in their first substantive paragraphs: "The Fifth and Fourteenth Amendments to the United States Constitution prohibit unconstitutionally abridging the Freedom of Speech and/or the Free Exercise of Religion." (Complaint at ¶¶ 179 (Count III) and 197 (Count IV)). Thus, as alleged in the Complaint, a violation of the First Amendment constitutes a violation of the Fourteenth Amendment when due process impinges rights under the First Amendment.

Notably, in *Graham*, the plaintiff did not make a claim under the Fourth Amendment, and the district court applied a standard completely different than the Fourth Amendment excessive force standard. 490 U.S. 390-91. In *Conn*, the Court did, in fact, address the plaintiff's Fourteenth Amendment claim. 526 U.S. at 293. The case law cited by Defendants simply does not stand for the proposition that Plaintiffs' Fourteenth Amendment claims should be dismissed.

For the foregoing reasons, Defendants' Motion to Dismiss should be denied in its entirety.

20

Respectfully submitted this 8th day of December, 2021.

/s/David J. Markese
David J. Markese
Florida Bar No. 0105041
Frederick H. Nelson
Florida Bar No. 0990523
**American Liberties Institute**
P. O. Box 547503
Orlando, FL 32854-7503
Phone: (407) 786-7007
Fax: (877) 786-3573
Email: rick@ali-usa.org
      dmarkese@ali-usa.org
*Counsel for Plaintiffs*
(Admitted *Pro Hac Vice*)

/s/ Kristin Fecteau Mosher
Kristin Fecteau Mosher (#19772)
**The Law Office of Kristin Fecteau**
5543 Edmonson Pike
Nashville, TN 37211
Phone: (615) 496-5747
Fax: (615) 691-7194
Email: kristin@fecteaulaw.com
*Local Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing has been forwarded via this Court's CM/ECF

system to:

Kenneth S. Williams, Esq. (#10678)
**Madewell, Jared, Halfacre,**
**Williams & Wilson**
230 N. Washington Ave.
Cookeville, TN 38501
Phone: (931) 526-6101
Fax: (931) 528-1909
Email: ken@madewelljared.com
*Counsel for Defendant*

D. SCOTT BENNETT
MARY C. DECAMP
Attorneys for Defendant Richard Melton,
in his individual capacity and Defendant
Stephen Henson, in his individual capacity
707 Georgia Avenue
Suite 300
Chattanooga, TN 37402
Telephone: (423) 498-378

on this the 8th day of December, 2021.

/s/David J. Markese
David J. Markese
Florida Bar No. 0105041
Frederick H. Nelson
Florida Bar No. 0990523
**American Liberties Institute**
P. O. Box 547503
Orlando, FL 32854-7503
Phone: (407) 786-7007
Fax: (877) 786-3573
Email: rick@ali-usa.org
          dmarkese@ali-usa.org
*Counsel for Plaintiffs*