| | |
|---|---|
| B.A.P., et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) NO. 2:20-cv-00065 |
| | ) |
| OVERTON COUNTY BOARD OF | ) |
| EDUCATION, et al., | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION

B.A.P. (a minor child) and Richard Penkoski (B.A.P.'s parent) filed an Amended Complaint under 42 U.S.C. § 1983 against the Overton County Board of Education (the Board), Richard Melton, and Stephen Henson. (Doc. No. 43). B.A.P. is a student at Livingston Academy in the Overton County School District, where Melton is the principal and Henson is a teacher. (Id. ¶¶ 8, 12). Melton and Henson are sued in their individual capacities. (Id. ¶¶ 15–16). Before the Court is Melton and Henson's fully briefed Motion to Dismiss. (Doc. Nos. 51, 52, 61, 62). For the following reasons, the Motion will be granted in part and denied in part.

## I. Background

This background is drawn from the Amended Complaint and its exhibits (Doc. Nos. 43, 43-1, 43-2), focusing on the allegations relevant to resolving the Motion to Dismiss.

### A. Incident

When B.A.P. arrived in Henson's classroom on August 25, 2020, she was wearing a shirt stating, "homosexuality is a sin - 1 Corinthians 6:9-10." (Doc. No. 43 ¶¶ 62–63). This shirt "express[ed] [B.A.P.'s] political viewpoint founded upon her religious beliefs" (id. ¶ 63), including her belief "in the Biblical mandate to spread the Gospel of Jesus Christ." (Id. ¶ 157; see also id. ¶

25 (alleging a "belief in a mandate to exercise her rights to freedom of speech and the free exercise of religion and to further her political, religious and social beliefs")).

Henson told B.A.P. to report to the principal's office, and she complied. (Id. ¶¶ 8, 68, 70). Principal Melton read from the school handbook and told B.A.P. that her shirt violated the dress code because it was "sexually connotative." (Id. ¶ 73–74). Melton asked B.A.P. if she brought a garment that could be used to cover the message on her shirt, and she said no. (Id. ¶¶ 75–76). Melton told B.A.P. that she would not be released from the office unless she changed her shirt. (Id. ¶ 78). Melton then instructed B.A.P. to call her parents and request a change of clothing, and B.A.P. informed them of the situation by text message. (Id. ¶¶ 77, 79–80).

B.A.P.'s father, Richard Penkoski, called the school and spoke to Melton. (Id. ¶ 81). Melton again stated that B.A.P.'s shirt violated the dress code because it included a message that was sexually connotative. (Id. ¶ 81–82). Penkoski ended the call to deliberate with family, and he soon called back and asked Melton for clarification on his interpretation of the dress code. (Id. ¶¶ 83– 85). Melton read from the dress code and clarified that B.A.P.'s shirt might be sexually connotative because the word "homosexuality" on her shirt included the word "sex." (Id. ¶¶ 86–88). Melton told Penkoski that B.A.P. would be forced to go home if she did not change her shirt, and the call ended. (Id. ¶¶ 93–94). B.A.P.'s stepmother came to the school and took her home, and B.A.P. was marked "absent" for the day. (Id. ¶¶ 97–98). "At all material times," Melton and Henson demanded that B.A.P. not wear the shirt to school again. (Id. ¶¶ 15–16, 58–59).

Plaintiffs maintain that B.A.P.'s shirt was consistent with an established practice of openly acknowledging issues of sexuality in the classroom setting. Specifically, Henson's classroom displayed what appears to be a standard 8.5x11 piece of printer paper affixed to a cabinet near the corner bearing the colors of the rainbow and the words, "diverse, inclusive, accepting, welcoming,

safe space, for everyone." (Id. ¶ 65; Doc. Nos. 43-1, 43-2 (Exhibits)). Plaintiffs characterize this image as "pro-homosexual." (Doc. No. 43 ¶¶ 64–66).

### B. Policies

The Board's dress code policy provides: "When a student is attired in a manner which is likely to cause disruption or interference with the operation of the school, the principal shall take appropriate action, which may include suspension." (Id. ¶¶ 42–43). The Board also delegates authority to school administrators to prepare and distribute a student handbook for their school. (Id. ¶¶ 3–4, 47–48). Melton drafted the handbook in effect at Livingston Academy for the relevant time period. (Id. ¶ 58). This handbook was given to Livingston Academy staff, including Melton and Henson, and staff were required to acknowledge receipt, read it, and ask administrators any questions about it. (Id. ¶ 55–59).

Livingston Academy's handbook includes a dress code providing, in relevant part, that students are to "display good taste in matters of dress," and that their regular school attire "should in no way disturb or distract other students or teachers from their normal scholastic pursuits." "Clothing with offensive messages, including advertisements for drugs, alcohol, tobacco, sexual connotations, or double meanings, is unacceptable." (Id. ¶ 49). The handbook does not define the terms "offensive messages," "sexual connotations," or "double meanings." (Id. ¶¶ 52–54).

### C. This Lawsuit

The Amended Complaint asserts four claims. Claims 1 and 2 are brought against all three Defendants—the Board, Melton, and Henson. These claims assert violations of Plaintiffs' First Amendment rights to freedom of speech and free exercise of religion. (Id. ¶¶ 137–77). Claims 3 and 4 are brought against the Board and Melton, but not Henson. Claim 3 asserts a deprivation of Plaintiffs' due process rights under the Fifth and Fourteenth Amendments. (Id. ¶¶ 178–95). And

Claim 4 asserts a violation of Plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment. (Id. ¶¶ 196–215). Melton and Henson move to dismiss all claims against them for failure to state a claim, or in the alternative, based on qualified immunity. (Doc. No. 51 at 1; Doc. No. 52 at 1).

## II.  Legal Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is plausible if the complaint "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (quoting Twombly, 550 U.S. at 556). In determining plausibility, the Court sets aside allegations consisting of "labels and conclusions" or "'naked assertion[s]' devoid of 'further factual enhancement.'" Id. (quoting Twombly, 550 U.S. at 555, 557).

## III.  Analysis

### A.  Plaintiff Penkoski's Personal Claims

Plaintiff Penkoski brings this action both "individually and in his representative capacity on behalf of B.A.P. and his other minor children in schools under the authority of" the Board. (Doc. No. 43 ¶ 13). Melton and Henson argue that Penkoski fails to state a claim against them on his own behalf because neither Melton nor Henson took an action against Penkoski that amounts to a violation of Penkoski's constitutional rights. (Doc. No. 52 at 13 n.2, 18 n.3). Plaintiffs do not acknowledge or respond to this argument. (See Doc. No. 61). Therefore, Plaintiffs have forfeited Penkoski's personal claims against Melton and Henson. See Swanigan v. FCA US LLC, 938 F.3d 779, 786–87 (6th Cir. 2019) (finding claim forfeited where defendants moved to dismiss it and

4

plaintiffs did not mention or rebut it in their response) (citing Am. Copper & Brass, Inc. v. Lake City Indus. Prods., Inc., 757 F.3d 540, 545 (6th Cir. 2014)).

Regardless of this forfeiture, moreover, the Court agrees with Melton and Henson. Plaintiffs seek to vindicate constitutional rights through Section 1983. "[S]ection 1983 provides a cause of action which is *personal* to the injured party." LeFever v. Ferguson, 645 F. App'x 438, 447 (6th Cir. 2016) (citing Purnell v. City of Akron, 925 F.2d 941, 948 n.6 (6th Cir.1991)) (emphasis in original). Plaintiffs' Section 1983 claims against Melton and Henson are premised entirely on actions allegedly taken against B.A.P., not Penkoski. "[A] minor's personal cause of action is her own and does not belong to her parent or representative." Shepherd v. Wellman, 313 F.3d 963, 970 (6th Cir. 2002) (citing Cheung v. Youth Orchestra Found. of Buffalo, Inc., 906 F.2d 59, 61 (2d Cir. 1990)); but see Winkelman ex rel. Winkelman v. Parma City Sch. Dist., 550 U.S. 516, 526 (2007) (holding that parents have "independent, enforceable rights under [the Individuals with Disabilities Education Act]," a federal statute not at issue here). Accordingly, Penkoski fails to state a personal claim against Melton and Henson.

### B.     Free Speech and Free Exercise

Turning to B.A.P.'s claims, the First Amendment protects freedom of speech and the free exercise of religion. U.S. Const. amend. I. "[S]tudents do not 'shed their constitutional rights to freedom of speech or expression,' even 'at the school house gate.'" Mahanoy Area Sch. Dist. v. B. L. by & through Levy, 141 S. Ct. 2038, 2044 (2021) (quoting Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 506 (1969)). A school environment, however, has "special characteristics" that courts must consider when applying the First Amendment to student expression. Id. (quoting Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 266 (1988)). For example, schools have the authority and responsibility to attend to "all students' psychological and

developmental needs." <u>Barr v. Lafon</u>, 538 F.3d 554, 567–68 (6th Cir. 2008). In light of that responsibility, the First Amendment may allow the regulation of expression by a student "that would be perfectly permissible if undertaken by an adult." <u>See</u> <u>Vernonia Sch. Dist. 47J v. Acton</u>, 515 U.S. 646, 655 (1995) (considering schools' regulatory authority over students in the Fourth Amendment context) (quoting <u>New Jersey v. T.L.O.</u>, 469 U.S. 325, 339 (1985)).

In <u>Tinker</u>, the Supreme Court explained that schools may regulate student speech that "materially disrupts classwork or involves substantial disorder or invasion of the rights of others." <u>Mahanoy Area Sch. Dist.</u>, 141 S. Ct. at 2045 (quoting <u>Tinker</u>, 393 U.S. at 513). This rule gives schools "special leeway" to "regulate speech that occurs under its supervision." <u>Id.</u> The Supreme Court has also "outlined three specific categories of [school-supervised] student speech that schools may regulate" outside of the <u>Tinker</u> framework. <u>See</u> <u>id.</u> Because the message on B.A.P.'s shirt does not fall into any of those three categories,[1] however, her First Amendment claims against Melton and Henson are squarely governed by the general rule in <u>Tinker</u>. <u>See</u> <u>Barr</u>, 538 F.3d at 564 (holding that <u>Tinker</u> governed the regulation of student clothing that was not school-sponsored) (citing <u>Castorina ex rel. Rewt v. Madison Cnty. Sch. Bd.</u>, 246 F.3d 536, 539–40 (6th Cir. 2001)).

<u>Tinker</u> presents a "difficult question: how to balance some students' rights to free speech with 'the rights of other students to be secure and to be let alone.'"[2] <u>Id.</u> at 562 (quoting <u>Tinker</u>, 393 U.S. at 508); <u>LaVine v. Blaine Sch. Dist.</u>, 257 F.3d 981, 992 (9th Cir. 2001) ("School officials

---

[1] B.A.P.'s shirt did not display "'indecent,' 'lewd,' or 'vulgar' speech," as contemplated by <u>Bethel School District No. 403 v. Fraser</u>. <u>Mahanoy Area Sch. Dist.</u>, 141 S. Ct. at 2045 (quoting 478 U.S. 675, 685 (1986)). It was not school-sponsored speech under <u>Kuhlmeier</u>. <u>Id.</u> (citing 484 U.S. at 271). And it did not "promote[] 'illegal drug use,'" as discussed in <u>Morse v. Frederick</u>. <u>Id.</u> (quoting 551 U.S. 393, 409 (2007)).

[2] The Tennessee legislature recognizes that "[a] safe and civil environment is necessary for students to learn and achieve high academic standards," and that "[h]arassment, intimidation, bullying or cyber-bullying, like other disruptive or violent behavior, is conduct that disrupts a student's ability to learn and a school's ability to educate its students in a safe environment." Tenn. Code Ann. § 49-6-4501 (1)(2).

6

have a difficult task in balancing safety concerns against chilling free expression."). "[T]o justify prohibition of a particular expression of opinion" under Tinker, a school must show that it acted out of "'more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint,' but rather, 'that the school authorities had reason to anticipate that the [student's expression] would substantially interfere with the work of the school or would impinge upon the rights of other students.'" D.B. ex rel. Brogdon v. Lafon, 217 F. App'x 518, 525 (6th Cir. 2007) (quoting Tinker, 393 U.S. at 509).

Schools, it bears emphasizing, are not required to wait for student speech to actually disrupt the school environment or interfere with other students' rights before acting. Defoe ex rel. Defoe v. Spiva, 625 F.3d 324, 335 (6th Cir. 2010) ("Tinker does not require that displays . . . *in fact* cause substantial disruption or interference."). "Nor does Tinker 'require certainty that disruption will occur.'" Lowery v. Euverard, 497 F.3d 584, 592 (6th Cir. 2007) (quoting Pinard v. Clatskanie Sch. Dist. 6J, 467 F.3d 755, 767 (9th Cir. 2006)). Indeed, "[s]chool officials have an affirmative duty . . . to prevent [disruptions] from happening in the first place," and "'[f]orecasting disruption is unmistakably difficult to do.'" Id. at 596 (quoting LaVine, 257 F.3d at 989). Therefore, the touchstone of Tinker is reasonability—"whether the record demonstrates 'any facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities.'" Defoe, 625 F.3d at 332 (quoting Tinker, 393 U.S. at 514); see also Hardwick ex rel. Hardwick v. Heyward, 711 F.3d 426, 440 (4th Cir. 2013) ("As long as school officials reasonably forecast a substantial disruption, they may act to prevent that disruption without violating a student's constitutional rights, and we will not second guess their reasonable decisions.") (quoting Tinker, 393 U.S. at 513–14).

Here, an adequate analysis of B.A.P.'s First Amendment claims against Melton and Henson requires a more developed record than is available on a motion to dismiss. Courts typically conduct a context-dependent inquiry to determine whether a school official's forecast of disruption was reasonable. See Lowery, 497 F.3d at 593 ("[T]he Court must evaluate the circumstances to determine if Defendants' forecast of substantial disruption was reasonable."); see also Pinard, 467 F.3d at 768 ("The Tinker rule is a flexible one, and in applying it, [courts] look to the totality of the relevant facts, including not only the plaintiffs' actions, but all of the circumstances confronting the school officials at the time.") (internal citations and quotation marks omitted). On this Motion, the Court can only consider the allegations in the Amended Complaint, which state a plausible claim for relief. Plaintiffs allege that Henson removed B.A.P. from class due to the message on her shirt, Melton did not allow her to return to class because of this message, and both Melton and Henson told B.A.P. she could not wear the shirt to school going forward. The Amended Complaint does not, however, supply specific facts and context about Livingston Academy and the surrounding community at the time Melton and Henson took these actions. Without this context, the Court cannot determine whether Melton and Henson reasonably forecasted that the message on B.A.P.'s shirt would cause substantial disruption or interference with the rights of other students. Accordingly, B.A.P.'s First Amendment claims against Melton and Henson will not be dismissed for failure to state a claim.

For largely the same reasons, the Court declines to resolve Melton and Henson's alternative defense of qualified immunity at this time. "To defeat a claim of qualified immunity, the plaintiff must show that the [defendant's] conduct (1) violated a constitutional right that (2) was clearly established." Anders v. Cuevas, 984 F.3d 1166, 1175 (6th Cir. 2021) (citing Cahoo v. SAS Analytics Inc., 912 F.3d 887, 897 (6th Cir. 2019)). The Sixth Circuit has often cautioned that "it

8

is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity." Courtright v. City of Battle Creek, 839 F.3d 513, 518 (6th Cir. 2016) (quoting Wesley v. Campbell, 779 F.3d 421, 433 (6th Cir. 2015)). Application of this general rule typically "rests on qualified immunity's clearly established prong." Crawford v. Tilley, 15 F.4th 752, 763–64 (6th Cir. 2021) (collecting cases).

Where "granting relief to the plaintiff can only be done by recognizing a novel constitutional right," granting qualified immunity to a defendant may be appropriate prior to factual development. Id. at 766. But that is not necessarily the case where "the clearly established inquiry may turn on case-specific details that must be fleshed out in discovery." Id. at 765. Plaintiffs point to Tinker as clearly establishing the First Amendment rights at issue in this case (Doc. No. 61 at 7–8, 12), and that is correct as a general matter.[3] But "clearly established law should not be defined at a high level of generality"—it "must be particularized to the facts of the case." White v. Pauly, 137 S. Ct. 548, 552 (2017) (internal citations and quotation marks omitted). The clearly-established prong does not require a plaintiff to identify an earlier decision that is "directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." Mullenix v. Luna, 577 U.S. 7, 12 (2015) (quoting Ashcroft v. al–Kidd, 563 U.S. 731, 741 (2011)). "[T]his narrow definition of 'clearly established' functions to protect 'all but the plainly incompetent or those who knowingly violate the law.'" Mitchell v. Schlabach, 864 F.3d 416, 424 (6th Cir. 2017) (quoting Mullenix, 136 S. Ct. at 308). As discussed above, the application

---

[3] Plaintiffs also cite a previous decision of this Court in their clearly-established analysis (Doc. No. 61 at 7–8 (discussing Young v. Giles Cnty. Bd. of Educ., 181 F. Supp. 3d 459 (M.D. Tenn. 2015)), but that reference is categorically unhelpful. A district court ordinarily identifies clearly established constitutional rights by looking to "binding precedent." Bletz v. Gribble, 641 F.3d 743, 756 (6th Cir. 2011) (quoting Ohio Civil Serv. Emps. Ass'n v. Seiter, 858 F.2d 1171, 1177 (6th Cir. 1988)). And "[a] decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case." Camreta v. Greene, 563 U.S. 692, 708 n.7 (2011) (quoting 18 J. Moore et al., Moore's Federal Practice § 134.02[1] [d], p. 134–26 (3d ed. 2011)).

of <u>Tinker</u>'s general rule to B.A.P.'s First Amendment claims is a context-dependent inquiry that requires further development. <u>See</u> <u>Brosseau v. Haugen</u>, 543 U.S. 194, 199 (2004) (holding that "general tests" do not provide "fair warning" of clearly established law outside an "obvious case"). Therefore, resolving the question of qualified immunity for these claims is a task better suited for summary judgment than a motion to dismiss. <u>See</u> <u>Hart v. Hillsdale Cnty., Mich.</u>, 973 F.3d 627, 642 (6th Cir. 2020) ("Absent any factual development beyond the allegations in a complaint, a court cannot fairly tell whether a case is 'obvious' or 'squarely governed' by precedent, which prevents us from determining whether the facts of this case parallel a prior decision or not.") (quoting <u>Evans-Marshall v. Bd. of Educ.</u>, 428 F.3d 223, 235 (6th Cir. 2005) (Sutton, J., concurring)); <u>Elliot v. Lator</u>, 497 F.3d 644, 650 (6th Cir. 2007) (citing <u>Kennedy v. City of Cleveland</u>, 797 F.2d 297, 299 (6th Cir. 1986), for the proposition that "qualified immunity may be raised both in a motion to dismiss or in a motion for summary judgment").

Finally, the Court notes that the parties refer to a "failure to train" claim against Melton as an independent ground for relief. (Doc. No. 52 at 15; Doc. No. 61 at 12–14). Different legal principles apply to a failure-to-train claim depending on whether it is an individual-capacity claim or an "official-capacity or municipal claim." <u>See</u> <u>Essex v. Cnty. of Livingston</u>, 518 F. App'x 351, 355 (6th Cir. 2013). Plaintiffs bring this action against Melton in his individual capacity only. (<u>See</u> Doc. No. 43 ¶ 15). And that makes sense, as it would be redundant to sue Melton in his official capacity because the Board—his employer—is separately named as a Defendant. <u>See</u> <u>Sagan v. Sumner Cnty. Bd. of Educ.</u>, 726 F. Supp. 2d 868, 876 (M.D. Tenn. 2010) ("[A] claim against an individual in her official capacity is tantamount to a claim against the employer and . . . where, as here, the employer is also sued, the official-capacity suit against the employee is simply redundant

and may be dismissed."). But the Board is not a party to this Motion to Dismiss, so the municipal-liability framework has no bearing on the claims currently before the Court.[4]

As relevant here, an individual-capacity failure-to-train claim is essentially a claim of supervisory liability. To state a such a claim, a plaintiff must allege that "the defendant supervisor [either] . . . encouraged the specific incident of misconduct or in some other way directly participated in it." Essex, 518 F. App'x at 355 (internal citations and quotation marks omitted). Direct participation means that the supervisor "at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." Id. (internal citations and quotation marks omitted). Alternatively, "a supervisor may be liable under § 1983 if he 'abandon[s] the specific duties of his position . . . in the face of actual knowledge of a breakdown in the proper workings of the department.'" Winkler v. Madison Cnty., 893 F.3d 877, 898 (6th Cir. 2018) (quoting Taylor v. Mich. Dep't of Corr., 69 F.3d 76, 81 (6th Cir. 1995)). Plaintiffs make the conclusory allegation that the Board's and Melton's "training and/or instruction" on the student handbook "is either erroneous or lacking in proper instruction to avoid violations of Plaintiffs' constitutional rights." (Doc. No. 43 ¶ 9; see also id. ¶¶ 15, 132–34). But Plaintiffs do not make allegations from which the Court can reasonably infer that Melton participated in Henson's action before B.A.P. arrived in his office, or that Melton had actual knowledge of a breakdown in the proper working of the school. Accordingly, B.A.P. cannot pursue First Amendment claims against Melton based on a theory of supervisory liability.

---

[4] Municipal liability claims require a plaintiff to show "that the municipality had a 'policy or custom' that caused the violation of his rights." Jackson v. City of Cleveland, 925 F.3d 793, 828 (6th Cir. 2019) (quoting Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978)). One way to show a policy or custom is to demonstrate "the existence of a policy of inadequate training or supervision." Id. (quoting Burgess v. Fischer, 735 F.3d 462, 478 (6th Cir. 2013)). A municipal failure-to-train claim has its own unique requirements. See id. at 834 (discussing elements) (citing Ciminillo v. Streicher, 434 F.3d 461, 469 (6th Cir. 2006)).

## C.    Due Process

Plaintiffs assert a due process claim under the Fifth and Fourteenth Amendments. As an initial matter, the Court notes that Plaintiffs' reliance on the Fifth Amendment is misplaced because the Fifth Amendment's due process guarantee "applies to federal, not state, officials." Palmer v. Schuette, 768 F. App'x 422, 426–27 (6th Cir. 2019) (citing Scott v. Clay Cnty., 205 F.2d 867, 873 n.8 (6th Cir. 2000)). The Court therefore analyzes this claim under the Fourteenth Amendment alone.

"The Due Process Clause of the Fourteenth Amendment says that no state shall 'deprive any person of life, liberty, or property, without due process of law.'" Schulkers v. Kammer, 955 F.3d 520, 539 (6th Cir. 2020) (quoting U.S. Const. amend. XIV, § 1). This provision contains distinct procedural and substantive components. See id. ("This clause ensures fair process and safeguards a substantive sphere as well, barring certain government actions regardless of the fairness of the procedures used to implement them.") (internal citations and quotation marks omitted). The Amended Complaint does not specify the nature of this claim. (See Doc. No. 43 ¶¶ 178–95). It does, however, use language that is more substantive than procedural. (See id. ¶ 187 (alleging that "Defendants and others [had] the opportunity to enforce restrictions in an ad hoc, arbitrary, and discriminatory manner")); Jones v. Byrnes, 585 F.3d 971, 976 (6th Cir. 2009) ("[T]he Fourteenth Amendment's due process provision has a substantive component that guarantees 'protection of the individual against arbitrary action of government.'") (quoting Wolff v. McDonnell, 418 U.S. 539, 558 (1974)). And Melton treats this as a substantive due process claim in the Motion to Dismiss (see Doc. No. 51 at 4; Doc. No. 52 at 19–20)—an approach that Plaintiffs do not attempt to clarify or correct. (See Doc. No. 61 at 19–20). Accordingly, the Court treats this as a substantive due process claim as well.

Melton moves for dismissal based on well-established Supreme Court precedent that a party cannot rely on the right to substantive due process for a claim whose underlying allegations are "necessarily governed by a more definite provision of the Constitution." See County of Sacramento v. Lewis, 523 U.S. 833, 842 (1998); (Doc. No. 52 at 19–20). "The Supreme Court has repeatedly held that where a particular amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing such a claim.'" Kiser v. Kamdar, 831 F.3d 784, 791 (6th Cir. 2016) (quoting Albright v. Oliver, 510 U.S. 266, 273 (1994)). Plaintiffs, despite contending that this holding does not apply here, seemingly acknowledge that their substantive due process claim is duplicative of their First Amendment claims. (See Doc. No. 61 at 20 ("[A]s alleged in the Complaint, a violation of the First Amendment constitutes a violation of the Fourteenth Amendment when due process impinges rights under the First Amendment.")). Accordingly, insofar as Plaintiffs seek to bring a substantive due process claim that that is distinct from their First Amendment claims, it will be dismissed. See Boroff v. Van Wert City Bd. of Educ., 220 F.3d 465, 471–72 (6th Cir. 2000) (noting that a student could not use substantive due process "as a fallback constitutional provision" for a free-speech claim directly addressed by the First Amendment); Hardy v. Unknown Agee, No. 14-2230, 2015 WL 13782958, at *3 (6th Cir. May 8, 2015) (affirming dismissal of substantive due process claim that was duplicative of First Amendment free-exercise claim).

### D. Equal Protection

"The Equal Protection Clause of the Fourteenth Amendment provides that a state may not 'deny to any person within its jurisdiction the equal protection of the laws.'" Maye v. Klee, 915 F.3d 1076, 1085 (6th Cir. 2019) (quoting U.S. Const. amend. XIV, § 1). "It is in essence 'a

direction that all persons similarly situated should be treated alike.'" <u>Robinson v. Jackson</u>, 615 F. App'x 310, 314 (6th Cir. 2015) (quoting <u>City of Cleburne v. Cleburne Living Ctr.</u>, 473 U.S. 432, 439 (1985)). "The threshold element of an equal protection claim is disparate treatment; once disparate treatment is shown, the equal protection analysis to be applied is determined by the classification used by government decision-makers." <u>Scarbrough v. Morgan Cnty. Bd. of Educ.</u>, 470 F.3d 250, 260 (6th Cir. 2006).

The Court need not proceed past the threshold element. Plaintiffs essentially argue that Melton treated B.A.P. differently because there were no consequences for one other student who said the word "sex" in front of Henson or five other students who wore "clothing that appeared to violate the same dress code" as B.A.P. (Doc. No. 61 at 16 (citing Doc. No. 43 ¶¶ 90, 109)). But these allegations do not establish disparate treatment by Melton because the Amended Complaint does not allege that Melton was even aware of these incidents. One student's alleged dress code infraction occurred at a different school. (<u>See</u> Doc. No. 43 ¶ 109(2)). As for the student saying "sex" in front of Henson, Plaintiffs do not allege that Melton was present for this comment or provide any basis to impute Henson's knowledge to Melton. (<u>See</u> <u>id.</u> 43 ¶ 90). And as for the four other students, Plaintiffs do not allege that Melton saw or knew about the clothing or expression at issue. (<u>See</u> <u>id.</u> ¶ 109(1), (3), (4), (5)). Plaintiffs' conclusory argument to the contrary does not make up for their lack of well-pleaded factual allegations on this subject. (<u>See</u> Doc. No. 61 at 19 (arguing that "it is not unreasonable to infer that Melton, as principle, was aware of the numerous apparent dress code infractions that he is admittedly responsible to address")). Accordingly, B.A.P. fails to state an equal protection claim against Melton. <u>See</u> <u>Pineda v. Hamilton Cnty., Ohio</u>, 977 F.3d 483, 491 (6th Cir. 2020) ("Section 1983 imposes liability only on a defendant who was personally involved in the unconstitutional action that caused the plaintiff's injury.").

## IV.     Conclusion

"Most parents, realistically, have no choice but to send their children to a public school and little ability to influence what occurs in the school." See Morse, 551 U.S. at 424 (Alito, J., concurring). Students, for their part, cannot simply opt out of attending school. See Tenn. Code Ann. § 49-6-3001 et seq. (mandatory school attendance laws). Over the years, the Supreme Court has explained some of the many ways that the school environment is unique. It is, of course, uniquely important to the vital responsibility of educating children. Brown v. Bd. of Educ. of Topeka, Shawnee Cnty., Kan., 347 U.S. 483, 493 (1954) ("[E]ducation is perhaps the most important function of state and local governments."). The school environment is also unusually close-quartered. "[Students] spend the school hours in close association with each other, both in the classroom and during recreation periods. The students in a particular class often know each other and their teachers quite well. Of necessity, teachers have a degree of familiarity with, and authority over, their students that is unparalleled except perhaps in the relationship between parent and child." T.L.O., 469 U.S. at 348 (Powell, J., concurring). And a public school is unique for its openness to all members of the community. "Through [the schoolroom] passes every citizen and public official, from schoolteachers to policemen and prison guards. The values they learn there, they take with them in life." Id., 469 U.S. at 385–86 (Stevens, J., concurring in part and dissenting in part).

Within this tightly packed and diverse environment, it is inevitable that students will encounter and exchange ideas with peers of different backgrounds and beliefs. That is a good thing. See Tinker, 393 U.S. at 512 ("[Personal intercommunication among students] is not only an inevitable part of the process of attending school; it is also an important part of the educational process.") (footnote omitted). But a school cannot advance its educational mission if the

interactions between students are so confrontational or contentious that there is no room for ordinary instruction. In recognition of this unavoidable reality, the Constitution recognizes school officials' power to regulate student expression based on their reasonable belief that one student's speech will interfere "with the school['s] work" or "colli[de] with the rights of other students to be secure and to be let alone." Id. at 508. Whether a given exercise of that power strikes a sufficient balance between protecting an individual student's First Amendment rights and maintaining a disruption-free environment depends on contextual details that do not lend themselves easily to resolution on the pleadings alone.

For these reasons, and the reasons explained above, Melton and Henson's Motion to Dismiss will be denied as to B.A.P.'s First Amendment claims and granted as to all other claims it covers—Penkoski's personal claims against Melton and Henson, B.A.P's due process claim against Melton, and B.A.P.'s equal protection claim against Melton. The Court again notes, for clarity, that Plaintiffs did not assert due process and equal protection claims against Henson, so no such claims are going forward. And the Board is not a party to this Motion, so Plaintiffs' claims against the Board are unaffected by this ruling.

An appropriate Order is filed herewith.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE