**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NORTHEASTERN DIVISION AT COOKEVILLE**

| | | |
|---|---|---|
| **B.A.P., a minor child by and through** | ) | |
| **her parent, RICHARD PENKOSKI;** | ) | |
| **and RICHARD PENKOSKI, as the** | ) | |
| **parent and legal guardian of B.A.P.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:20-cv-00065** |
| | ) | |
| **OVERTON COUNTY BOARD OF** | ) | **Chief Judge Waverly D. Crenshaw, Jr.** |
| **EDUCATION, RICHARD MELTON,** | ) | **Magistrate Judge Alistair E. Newbern** |
| **and STEPHEN HENSON,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## RESPONSE OF INDIVIDUAL DEFENDANTS IN OPPOSITION TO PLAINTIFFS' MOTION FOR SANCTIONS DUE TO SPOLIATION

NOW COME the Individual Defendants, Richard Melton and Stephen Henson, by and through counsel, and, pursuant to L.R. 7.01(a)(3), respectfully submit this Response in opposition to Plaintiffs' Motion for Sanctions due to Spoliation.

It is difficult, at times, to parse which of Plaintiffs' allegations are being made solely against Defendant Overton County Board of Education (OCBOE) and which are being made against one or both Individual Defendants. The Individual Defendants will endeavor to address only the allegations that pertain, or might pertain, to them. In so doing, it is possible that they will address an allegation directed only at OCBOE. If so, that is being done out of an abundance of caution, to ensure that the Individual Defendants do not fail to respond to an allegation that is directed at one or both of them.

# I.    RELEVANT TIMELINES

Plaintiffs filed their initial Complaint on October 16, 2020, naming OCBOE as a Defendant. (Doc. No. 1). As noted in Plaintiffs' Exhibit D, OCBOE's responses to Plaintiffs' first discovery requests were finalized in February 2021. (Doc. No. 106-4 at PageID# 781). Also in February 2021, Mr. Henson left his job at Livingston Academy and went to work for a different school system. (Ex. 1: Depo. of Stephen Henson at p. 48, l. 3-15).

Plaintiffs filed their Amended Complaint officially naming Mr. Melton and Mr. Henson as Individual Defendants on October 5, 2021. (Doc. No. 43). After the Court entered its Order regarding the Individual Defendants' Motion to Dismiss (Doc. No. 69), the Individual Defendants filed their Answer to the Amended Complaint on June 15, 2022. (Doc. No. 73).

Plaintiffs submitted Requests for Admission, Requests for Production of Documents, and Interrogatories to each Individual Defendant on November 12, 2022, five months after the Individual Defendants filed their Answer. The Individual Defendants submitted responses and answers to all of these discovery requests on December 12, 2022, not December 27 or December 8, as stated by Plaintiffs. Among other documents, Plaintiffs have been in possession of the documents comprising Doc. Nos. 106-1 (Exhibit A) and 106-9 (Exhibit I) since December 12, 2022. Plaintiffs never submitted any other written discovery requests to the Individual Defendants.

Mr. Melton and Mr. Henson were deposed in their individual capacities on June 13, 2023. Mr. Melton was deposed as one of two *Fed. R. Civ. P.* 30(b)(6) representatives of OCBOE on July 28, 2023. Discovery closed on August 4, 2023. (Doc. No. 87).

On July 10, 2023, all counsel participated in a telephone conference with Judge Newbern to discuss disputes regarding the 30(b)(6) notice Plaintiffs had submitted to OCBOE. During this

2

conference, Judge Newbern told counsel for Plaintiffs that counsel could file a spoliation-related motion regarding text messages between the Individual Defendants if desired.

## II.    AUTHORITY GOVERNING SPOLIATION

A party seeking a spoliation sanction "must establish (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; *and* (3) that the destroyed evidence was relevant to the party's claim or defense." *Adkins v. Wolever*, 692 F.3d 499, 503-504 (6th Cir. 2012). A culpable state of mind can be shown "'by a showing that the evidence was destroyed knowingly, even if without intent to breach a duty to preserve it, or negligently.'" *Id.* at 504-505 (quoting *Beaven v. United States Dep't of Justice*, 622 F.3d 540, 554 (6th Cir. 2010)). "When appropriate, a proper spoliation sanction should serve both fairness and punitive functions, but its severity should correspond to the district court's finding after a fact-intensive inquiry into a party's degree of fault under the circumstances." *Adkins* at 504. This includes, "a recognition that a party's degree of fault may range from innocence through the degrees of negligence to intentionality." *Id.*

*Fed. R. Civ. P.* 37(e) provides that:

 If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, <u>and it cannot be restored or replaced through additional discovery</u>, the court: (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may: (A) presume that the lost information was unfavorable to the party; (B) instruct the jury that it may or must presume the information was unfavorable to the party; or (C) dismiss the action or enter a default judgment.

(emphasis added).

Plaintiffs incorrectly assert that the Defendant and the Individual Defendants had an obligation, irrespective of the present litigation, to preserve emails.  In support of this argument,

3

they mistakenly rely on the Secretary of State's Records Retention Standards, attached as Exhibit C to their Motion. These standards, however, only apply to state agencies. *Tenn. Code Ann.* § 10-7-301(1). Counties and their respective agencies are governed by *Tenn. Code Ann.* § 10-7-401 and the rules their own county records commissions promulgate pursuant to *Tenn. Code Ann.* § 10-7-503(g)(1). Plaintiffs cite nothing within the rules of the Overton County Records Commission that mandate the retention of all OCBOE employee emails, much less text messages.

Simply put, an email is not a public record simply because it is sent or received by a public employee using a public computer system. *Brennan v. Giles County Bd. Of Educ.*, 2005 WL 1996625 (Tenn. Ct. App. Aug. 18, 2005). To be considered a "public record" under Tennessee law, a document must first meet the definition of "public record;" that is, it "must be 'made or received pursuant to law or ordinance or in connection with the transaction of official business by any governmental agency.'" *Id.* (quoting *Tenn. Code Ann.* § 10-7-301(6)). Even if it meets this definition, however, it still may not ultimately be considered a public record for purposes of retention and public production. *Id.* "'[O]nly materials prepared with the intent of <u>perpetuating and formalizing knowledge</u> fit the definition of a public record.'" *Id.* (quoting *Times Publishing Co. v. City of Clearwater*, 830 So. 2d 844 (Fla. Dist. Ct. App. 2002)(emphasis added)(internal citations omitted)).

Thus, even if a document was made or received in transaction of official business, it may not be a public record if it was not prepared with the intent to perpetuate and formalize knowledge. Examples of such temporary records include "working papers," which include drafts or other records that become obsolete shortly after use. *Tenn. Code Ann.* § 10-7-301(14). Irrespective of whatever rules the Secretary of State may have promulgated for state agencies, counties have no obligation to preserve these temporary records. *Tenn. Code Ann.* § 10-7-404(a).

Additionally, Plaintiffs misstate the law in the Sixth Circuit. Plaintiffs incorrectly state that the Sixth Circuit reached a spoliation-related holding in *Fujitsu Ltd v. Federal Express Corp.* The *Fujitsu* case was decided in the Second Circuit, not the Sixth. 247 F.3d 423 (2d Cir. 2001). While the Sixth Circuit did refer to *Fujitsu* in *John B. v. Goetz, Goetz* is a class-action matter about the TennCare program and involved an allegation that the defendants had failed to preserve relevant ESI for several years. 531 F.3d 448 (6th Cir. 2008). Specifically, the Sixth Circuit noted that the defendants in *Goetz* only began seeking to preserve documents six years after the action was filed. *Id.* at 454. There is no comparable timeline here. The facts in *Goetz* are clearly distinguishable from the case at bar.

The plaintiffs also reference *Johnson v. Metropolitan Gov't of Nashville,* 502 F. App'x 523 (6th Cir. 2012). *Johnson* is an employment discrimination case involving plaintiffs who alleged that they were wrongly denied promotions. In making this claim, those plaintiffs asserted that the defendant employer should have preserved survey scores. Though the Sixth Circuit ultimately denied the plaintiffs' request for spoliation sanctions, it agreed that the defendant should have preserved the survey results, noting, in part, that the employer was obligated under Title VII and EEOC regulations to do so. In this case, however, there are no federal regulations that mandate OCBOE or the Individual Defendants retain emails, much less text messages.

Finally, as with *Fujitsu*, *Bagley v. Yale University* arises out of the Second Circuit. It is an unreported district court decision and, therefore, not binding or relevant authority. 2016 WL 7407707 (D. Conn. Dec. 12, 2016). Moreover, it is an employment matter in which the employee plaintiff began threatening legal action eleven months before the defendant sought to begin preserving any evidence. As with *Goetz*, the preservation timeline and related actions in *Bagley* are not comparable to the present matter.

5

### III.  LAW AND ARGUMENT

**A.  Any Issues Not Previously Raised in Conformity with L.R. 7.01 and the Practice and Procedure Manual are Waived**

Some of the issues in Plaintiffs' Memorandum were not previously raised with the Defendants or via the required procedures set forth in L.R. 7.01 and the Practice and Procedure Manual for Judges and Magistrate Judges for the Middle District of Tennessee. Given that Plaintiffs did not follow the proper procedure, which includes, but is not limited to, first taking steps to address these matters with defense counsel, any issues not brought up via proper procedure are waived and should not be considered by this Court.

On PageID# 668 of Doc. No. 106, Plaintiffs state that the Individual Defendants "had control over their own emails," suggesting that, perhaps, some of their emails were not produced or were destroyed. There is no evidence of this. Moreover, Plaintiffs never raised any questions or issues about the discovery responses submitted by Individual Defendants at any time prior to the filing of this Motion. They, therefore, did not follow proper procedure. Any such claim being brought for the first time now has been waived.

Plaintiffs also wrongly assert that the Defendants withheld evidence from them in this matter. There is no evidence to support this allegation. Plaintiffs received some discovery production from OCBOE in February 2021. Plaintiffs received discovery production from Individual Defendants in December 2022, some of which was duplicative of what they had already received from OCBOE and some of which had not previously been produced. Most recently, on July 25, 2023, OCBOE produced a handful of additional emails. While it is inarguable that the production timeline was protracted, that does not support Plaintiffs' claim that any of the Defendants withheld evidence from Plaintiffs. Moreover, Plaintiffs raised this issue for the first time in their August 18 Motion.

6

Additionally, Plaintiffs take issue with some of the emails that OCBOE produced to Plaintiffs on July 25, 2023. Plaintiffs did not raise any issue with the content or timing of these recently produced emails with the Individual Defendants prior to the filing of their August 18, 2023 Motion. Again, they did not follow proper procedure. Their issues with regard to these emails should therefore not be considered.

Plaintiffs further assert that, if they had received the emails that they got from OCBOE on July 25, 2023, earlier in time, they would have been able to ask Mr. Melton and Mr. Henson questions about these emails during their June 13 depositions. Again, Plaintiffs never raised this issue prior to filing their Motion. Further, if Plaintiffs sincerely wanted to address these emails with Mr. Melton and/or Mr. Henson they would have attempted to do so prior to the close of discovery, either via seeking to re-open their depositions or take some other discovery-based action. The OCBOE 30(b)(6) deposition was held on July 28, 2023, and, at a minimum, counsel for the Plaintiffs could have brought this to the attention of counsel for the Defendants at that time. That was not done.

**B.     Tennessee's Public Records Laws Do Not Support the Plaintiffs' Argument**

Plaintiffs aver that all communications of Defendants, "electronic and otherwise, concerning this incident are Public Record." (Doc. No. 106 at PageID# 657). There are several problems with this argument.  First, as noted above, the Plaintiffs rely on the Secretary of State's Records Retention Standards, which do not apply to OCBOE.  Second, as explained in *Brennan*, not every email sent or received by a public employee is a public record. Even if one were sent or received as part of official business, any such email would only become a public record if it were intended to perpetuate or formalize knowledge. 2005 WL 1996625 (Tenn. Ct. App. Aug. 18, 2005). Third, there is no authority whatsoever that text messages sent on personal cell phones are public

records. These messages, by their nature, are temporary and do not formalize anything. Finally, as pointed out elsewhere in this Response, there is no evidence of any missing emails or text messages apart from the two texts exchanged between Mr. Henson and Mr. Melton on the morning of August 25, 2020. Plaintiffs' insistence to the contrary is rank speculation.

### C. Plaintiffs' Claims that Defendants Knew or Should have Known Litigation was Imminent are Unfounded

In support of their request for sanctions, Plaintiffs claim that the Individual Defendants knew or should have known that litigation was inevitable as early as August 25, 2020. Perhaps Plaintiffs believe that the Individual Defendants should have known that litigation was likely because, unbeknownst to them, Plaintiffs had enlisted the assistance of attorneys before B.A.P. even left school on August 25, 2020. Copies of texts that B.A.P. exchanged with her stepmother while she was waiting in the front office after Mr. Melton had told her that her shirt violated the dress code reveal that, at 9:34 am that morning, her stepmother texted her that her father, Richard Penkoski, "talked to a lawyer. They are going to have to suspend you if they don't want you wearing the shirt." (Ex. 2: Texts between B.A.P. and Stepmom at p. 8). Thus, Plaintiffs were in communication with legal counsel almost immediately on August 25, 2020. While the Plaintiffs were certainly anticipating litigation, the same cannot be said of the Individual Defendants.

Plaintiffs reference an email that Mr. Penkoski sent Mr. Melton during the morning of August 25 and emails Mr. Penkoski sent Mr. Melton on September 10, indicating that Mr. Penkoski's language should have put Mr. Melton on notice that litigation was likely. As a public school principal, Mr. Melton regularly interacts with parents who take issue with various school-related matters, often multiple times a day. Almost none of these interactions ever result in litigation. The language in these emails would not have put Mr. Melton or any reasonable, similarly situated individual on notice that litigation was on the horizon. Of course, it is possible that Mr.

8

Penkoski sent these emails at the behest of his attorneys as they were preparing for litigation, but the Individual Defendants were not in a position to know that.

In further support of their subjective claim that the Individual Defendants should have known that litigation was imminent, Plaintiffs reference that Mr. Henson expressed that he felt targeted by both Plaintiffs. It is correct that, by the end of the day on August 25, 2020, Mr. Henson felt that the Plaintiffs were targeting him due to multiple actions they had taken toward and with regard to him before and on August 25, 2020. (Ex. 1 at p. 8, l. 17 to p. 9, l. 11; Ex. 3: 8.25.20 Email from Henson to Winningham). It is likewise true that he expressed concerns that he felt Plaintiffs' actions were violative of some of his rights. (Ex. 3). But there is no evidence that Mr. Henson ever indicated during that timeframe that he was contemplating filing a lawsuit. Rather, Mr. Henson lodged an informal complaint to his superiors, as employees do across all employment sectors. In response, and as his supervisor, Mr. Melton tried to address Mr. Henson's concerns. This included, but was not limited to, meeting with Mr. Henson and his union representative. This is a common way for school administrators to try and work through issues and concerns expressed by members of school staff. There is nothing that Mr. Henson said or wrote prior to the initiation of the Plaintiffs' lawsuit that would have or should have put Mr. Melton or anyone else affiliated with OCBOE on alert that a lawsuit filed by Mr. Henson was imminent or even likely. Mr. Henson has never filed a lawsuit arising out of any of these events.

Further, contrary to the Plaintiffs' assertions, Mr. Melton did not inform Dr. Winningham of the dress code matter because he anticipated litigation. As evidenced by many of the documents comprising Plaintiffs' Exhibit I (Doc. No. 106-9), prior to August 25, 2020, Mr. Penkoski raised issues with other teachers at Livingston Academy, and Mr. Melton had kept Dr. Winningham apprised of those matters as well. (Doc. No. 106-9 at PageID# 847-855).

Notwithstanding the above, it is inarguable that Plaintiffs filed their lawsuit 52 days after B.A.P. wore the shirt to school. However, Plaintiffs' conclusory claim that their submission of "a preservation of evidence letter would have been pointless and could hardly have even been sent sooner than the lawsuit was filed" (Doc. No. 106 at PageID# 658) is incorrect. Clearly, Plaintiffs were engaging with legal counsel no later than August 25, 2020. A preservation letter could have been submitted by counsel for Plaintiffs on that very same day or shortly thereafter. It is unreasonable to assert that sending a preservation letter early in time would have been "pointless." Individual Defendants are not claiming that Plaintiffs were obligated to submit a preservation letter, but, had they done so, some or all of the issues Plaintiffs now raise might have been avoided.

**D.** **Text Messages Between Richard Melton and Stephen Henson were not Spoliated**

There are two text messages that were exchanged between Mr. Melton and Mr. Henson on their personal cell phones on August 25, 2020, that neither of them still possesses in their original format. These are the only two text messages known to the Individual Defendants that they exchanged with each other that 1) are relevant to this matter and 2) they have not been able to produce as initially written. Notably, Mr. Henson referenced both of these texts and quoted one verbatim in the summary he wrote on October 20, 2020. (Doc. No. 106-1 at ¶3; Ex. 4: Summary of Stephen Henson).

Mr. Melton and Mr. Henson became aware of the lawsuit when it was initially filed in October 2020. As principal and as the only person who directly handled the dress code issue involving B.A.P.'s shirt on August 25, 2020, Mr. Melton naturally played a more central role in the litigation than Mr. Henson, a teacher. Even so, and while both were referenced in the Complaint, neither was initially a party. Mr. Melton documented his recollection of the relevant events. (Ex. 5: Summary of Richard Melton). He was also told, at some point, to keep everything. (Ex. 6: Depo.

10

of Richard Melton at p. 16, l. 23-24). Although Mr. Henson did not actively participate in this litigation before being named a party, he nevertheless determined, based on advice from his father[1], to draft his own summary of events on October 20, 2020, and to preserve other documentation he believed relevant, or possibly relevant, to the litigation. As noted above, Mr. Henson left his employment at OCBOE in February 2021. (Ex. 1 at p. 48, l. 3-15).

Mr. Melton and Mr. Henson were not added as parties to this matter until October 2021, almost exactly one year after the Complaint was filed. Mr. Henson had not been an OCBOE employee for eight months at the time he was added as a party. It was discovered after they were added as parties that neither of them still possessed these two texts in their original format. Of course, Mr. Melton and Mr. Henson are educators. Neither of them has a legal background or any knowledge of the rules of civil procedure. It is unreasonable to expect that they would have known that they needed to take affirmative steps to preserve text messages on their personal cell phones.

To that point, Plaintiffs have misrepresented the Individual Defendants' actions with regard to these text messages and neglected to include key relevant portions of their deposition testimonies. First, Plaintiffs incorrectly state that Mr. Melton "deleted the text messages, because he did not deny that he deleted the messages." (Doc. No. 106 at PageID# 662). In fact, his deposition testimony was as follows:

> Q.     Is there a reason you didn't turn over this text message between you and Mr. Henson?
> MS. DECAMP:  Object to the form.
> THE WITNESS:  No reason.
> BY MS. MOSHER:
> Q.     Where is it now?
>  A.     I don't know.
> Q.     Do you still have that same phone?

---

[1] Mr. Henson's father is a physician and has testified as a witness in multiple trials. Given that experience and his resulting knowledge that litigation can take a long time, he advised his son to promptly "write things down." (Ex. 1 at p. 54, l. 2-12).

A.    I think so.
Q.    Do you automatically delete e-mails *(sic)* off your phone?
A.    No.
MS. DECAMP:  Object to the form.
THE WITNESS:  I may have gotten a new phone.  I don't know.
BY MS. MOSHER:
Q.    What could you consult to find out?
A.    I can look at my phone --
Q.    Okay.
A.    -- to see if I have it.
MS. MOSHER:  Want to take a break and see if we can find that on his phone?
MS. DECAMP:  Do you want to do that?
THE WITNESS:  Do you want me to do it?
MS. DECAMP: Let's take a quick break. If you could, send us whatever preservation you sent at the onset of this matter, that would be helpful.[2]

(Ex. 6 at p. 16, l. 25 to p. 18, l. 4). A few minutes later in the deposition, Mr. Melton further

testified, with regard to these text messages:

Q.    So you thought the secretaries should write a statement for documentation, but you shouldn't save the text message that said why she was being asked to --
A.    I didn't.
MS. DECAMP:  Object to the form.
THE WITNESS:  I never said I shouldn't save it.
BY MS. MOSHER:
Q.    Okay. Well, why didn't you?
A.    I don't know why. I don't know where it went. I might have changed phones. I'm not sure how long I've had this new used phone. That's been three or four years, something like that.
Q.    What could you consult to find out?
A.    I don't know.
Q.    Could you consult your cell phone records?
A.    I could. I've never done anything like that.
Q.    Wouldn't that tell you when you procured the phone you have right now?
A.    Yes.
Q.    It would, wouldn't it?
A.    Yes, it would. I wasn't sure what you were asking.
Q.    Who is your carrier?
A.    Verizon.

---

[2] Contrary to Plaintiffs' claims that Mr. Melton's counsel "interrupted the deposition" to ask for a copy of Plaintiffs' preservation letter, as the excerpt shows, the request was made after it was announced that a break would be initiated so that Mr. Melton could look for the text messages.

(Ex. 6 at p. 22, l. 4 to p. 23, l. 5). Contrary to Plaintiffs' assertion, Mr. Melton's testimony demonstrates that it is not logical, and is, in fact, incorrect to conclude that he deleted these text messages. Plaintiffs also misstate Mr. Melton's testimony regarding his iCloud account. He never said that his iCloud account backs up his phone. He testified that he does not have an iCloud account. (Ex. 6 at p. 13, l. 25 to p. 14, l. 6, p. 18, l. 16-18). Additionally, Mr. Melton did not say, as Plaintiffs claim, that the text message he sent to Mr. Henson was "school business," (Doc. No. 106 at PageID# 663); he testified that "dress code is school business." (Ex. 6 at p. 14, l. 12)(emphasis added).

Plaintiffs further misrepresent Mr. Melton's testimony regarding the content of the text messages copied into Mr. Henson's summary. The content from the summary is as follows:

> I saw that her shirt said what the other teacher reported and I sent Mr. Melton a text confirming the message on her shirt. He responded to my text saying 'I will take care of it. Thanks. Our dress code clearly states no clothing with sexual connotation…we treat all children the same.'

(Ex. 4). With regard to Mr. Melton's text to him, Mr. Henson testified, in response to a question from his own counsel, that he "wrote exactly what [the text message] said." (Ex. 1 at p. 116, l. 11-12). Mr. Henson confirmed that he copied Mr. Melton's text exactly as written in response to a follow-up question from his counsel:

> Q.    So if we had that text, would the content be the same as what you've put in your summary here?
> A.    Yes, ma'am.

(Ex. 1 at p. 116, l. 15-18). Plaintiffs claim that Mr. Melton testified that he did not know whether Mr. Henson copied the entirety of Mr. Melton's text into his summary, but this was not his whole testimony. Mr. Melton did not have a specific memory of this text exchange with Mr. Henson but did not dispute that it occurred:

13

Q.    You had asked him to confirm for himself what the shirt said, not just what he heard, right?  Is that right?

A.    I don't necessarily remember that, but, yes, it sounds right.

Q.    He said he sent you a text confirming the message on [B.A.P.'s] shirt, correct?

A.    Yes.

Q.    And if you responded to the text saying, "I will take care of it.  Thanks.  Our dress code clearly states no clothing with sexual connotation dot dot dot.  We treat all children the same."  Do you see that?

A.    Yes.

Q.    Do you remember sending that text message back?

A.    Not specifically.  But, if he quoted it, I sent it, I'm sure.

(Ex. 6 at p. 15, l. 9 to p. 16, l. 1). As for the ellipsis in the text, Mr. Melton testified as follows:

Q.    Do you know if that "dot dot dot" means he left out part of your message?

A.    I don't know.

Q.    Do you send text messages that have "dot dot dot" in them like that?

A.    It's possible.

Q.    So is it possible we're missing part of the text message you sent him?

A.    I can't say. I don't know.

(Ex. 6 at p. 16, l. 2-10). While Mr. Melton did not have a definitive memory of the entirety of the text he sent to Mr. Henson, he admitted that it is possible he sent a text with an ellipsis in it. Of course, Mr. Henson, the person who took the time to copy the content of the text into his summary, testified that he copied it exactly as written. (Ex. 1 at p. 116, l. 11-12).

While Mr. Henson did not copy his text to Mr. Melton verbatim into his summary, per the summary, the substance of that text amounted to informing Mr. Melton that Mr. Henson confirmed that the content of B.A.P.'s shirt matched what another teacher had previously told him. (Ex. 4; Ex. 1 at p. 53, l. 1-3). Mr. Melton's quoted response confirms the substance of Mr. Henson's original text.  It is further confirmed by details in Mr. Melton's summary, in which Mr. Melton wrote that another teacher had first observed the content of the shirt, underscoring the need for Mr. Henson to view the content of the shirt himself and then text Mr. Melton to confirm it. (Ex. 5).

Plaintiffs assert, with reference to Mr. Henson, that it is "quite suspect" that these texts were deleted. But Mr. Henson made clear that he did not intentionally delete these text messages:

14

Q.     How come you don't have this text anymore?
A.     I believe my phone is set to automatically delete texts after a certain period of time. I've never been in a legal case before. I've never had to keep text messages, so it just automatically does.
Q.     Do you have an iCloud backup?
A.     I do, but it's small and it's been full for years.
Q.     Well, this happened several years ago. Have you checked your iCloud to see if the text message is still there?
A.     I've checked on my phone. I don't know how to check iCloud.
Q.     So you haven't checked the iCloud, then?
A.     I don't know how to, but no.

(Ex. 1 at p. 21, l. 25 to p. 22, l. 15). Additionally, he testified in response to a question from his own counsel as follows:

Q.     Did you intentionally delete these texts you've been referencing?
A.     No.

(Ex. 1 at p. 115, l. 15-17). It is not at all suspect that Mr. Henson does not have these texts in their original formats. He made clear he did not intentionally delete them. He believes they automatically deleted at some point. Plaintiffs' request for sanctions should be denied based solely on the fact that they neglected to disclose all testimony relevant to these text messages and made inferences of intentionality of destruction when they knew, based on the omitted testimonies of Mr. Melton and Mr. Henson, that there was no such intentionality.

It is correct that Mr. Henson preserved other texts he exchanged with Mr. Melton on August 25, 2020. (Doc. No. 106-5 at PageID# 804). But this was not because he believed or knew litigation was imminent. These texts pertained to Facebook posts that Mr. Penkoski was making about Mr. Henson on August 25, 2020. As noted above, by the end of the day on August 25, 2020, Mr. Henson felt that both Plaintiffs were targeting and harassing him as a result of multiple actions they took toward and with regard to him before and on August 25, 2020. (Ex. 1 at p. 8, l. 17 to p. 9, l. 2; Ex. 3). This was understandably concerning to Mr. Henson. Because, for him, this was an

15

employment-based issue, Mr. Henson made his concerns known to Mr. Melton and Dr. Winningham.

Plaintiffs repeatedly speculate that, since the Individual Defendants did not produce the two texts at issue in their original formats, there must be other texts and emails that the Individual Defendants have failed to produce or have destroyed. Plaintiffs offer no objective information or evidence to substantiate this claim. There is, in fact, no evidence to support it.

Fundamentally, it is correct that neither Mr. Henson nor Mr. Melton can produce these two texts in their original format. But there is no evidence that either Mr. Melton or Mr. Henson intentionally deleted these texts or knowingly permitted their deletion. Their testimonies directly refute any allegation that there was intentional destruction. Mr. Henson indisputably preserved these two texts, albeit in a different format. *Fed. R. Civ. P.* 37(e) permits sanctions for spoliation of evidence only when that evidence "cannot be restored or replaced through additional discovery." *Id.* Indeed, here, the parties can know and consider the content of both of these text messages, as they were referenced in Mr. Henson's summary. Mr. Melton's text was copied exactly, and, though Mr. Henson's text was not, he accurately summarized its contents, as confirmed by Mr. Melton's response and Mr. Melton's own summary. Plaintiffs offer no actual evidence to refute the content of either of these messages as copied in Mr. Henson's summary. Indeed, Mr. Melton texted Mr. Henson that he would "take care of it," and that is precisely what he did, as it is undisputed that Mr. Melton is the one who told B.A.P. that her shirt violated the dress code because it contained a sexual connotation. (Ex. 7: Depo. of B.A.P. at p. 40, l. 10-19). The content of these two texts has not been lost. There is no spoliation, and no sanctions are warranted.

In response, Plaintiffs will likely argue that they assume or believe that there was more content to these texts than is readily apparent from Mr. Henson's summary. There is no evidence

to support this claim. This is simply more speculation, which is not a basis for sanctions. Further, if Plaintiffs believed any of their arguments to be persuasive, they would not have left out relevant portions of the depositions of Mr. Melton and Mr. Henson to try to make their points.

### E. Plaintiffs Have Unduly Delayed Seeking to Reinstate Their Previously Dismissed Claim

Plaintiffs argue that, if they had had these texts and/or Mr. Henson's summary at the time that the Individual Defendants filed their Motion to Dismiss, Plaintiffs' failure to train/supervisory liability claim against Mr. Melton may have survived dismissal. That argument, on its face, is misplaced; the content of these texts squarely supports the Individual Defendants' arguments and would have been a basis for summary judgment had the Court not found the Amended Complaint deficient on this point.

More importantly, Plaintiffs are making this argument for the first time in their August 18, 2023, Motion. Plaintiffs have had Mr. Henson's summary since December 12, 2022, some eight months before discovery closed. If Plaintiffs believed that this content supported their dismissed claim of supervisory liability against Mr. Melton, they would have brought that to the Court's attention during those eight months, likely very close in time to their receipt of the summary and certainly before party depositions were taken. Moreover, particularly given the length of time that this matter has been pending, if Plaintiffs considered this to be a legitimate issue, they had a duty to raise that with this Court and put Defendants on notice as soon as possible. They did not do so.

Some of the factors that warrant denial of a motion to amend are relevant here. Specifically, Plaintiffs have unduly delayed bringing this to the Court's attention, and permitting them to reinstate this previously dismissed claim after the close of discovery would amount to undue prejudice to the Defendants. *See, Duggins v. Steak'N Shake*, 195 F.3d 828, 834 (6th Cir. 1999)(holding that permitting amendment would unduly prejudice the defendant when the plaintiff

17

was aware of the basis of a claim for several months and delayed pursuing the claim until after discovery closed). Plaintiffs' request that this Court reinstate their supervisory liability claim against Mr. Melton should be denied.

F.     **Plaintiffs' Allegations That Melton and Henson Engaged in a Conspiracy to Destroy Evidence are Groundless**

Plaintiffs astonishingly assert that a few of the emails that they received from OCBOE on July 25, 2023, suggest that Mr. Melton and Mr. Henson conspired together to formulate a plan to "come up with new evidence and new reasons" and even to destroy evidence in an effort to defeat Plaintiffs' lawsuit. (Doc. No. 106 at PageID# 670). In support, Plaintiffs reference two emails from Doc. No. 106-6 at PageID# 814 and 815. Both emails are dated October 30, 2020, or two weeks after Plaintiffs filed suit. The first email is from Mr. Henson to Mr. Melton and includes the subject line, "Applicable?" The first sentence reads, "[y]ou asked me to send you everything I find about this." The email contains publicly available information about First Amendment case law.

Contrary to Plaintiffs' claims, there is nothing in this email to suggest that there was any prior written communication, either email or text, between the Individual Defendants that may have led to this email or that there is some other written communication in which Mr. Melton or Mr. Henson proposes the two engage in a "conspiracy." There is likewise nothing to suggest that Mr. Melton asked or directed Mr. Henson to conduct "research," a word not found in these emails. At the time these emails were sent, the lawsuit had just been filed, and Mr. Henson was obviously doing some legal reading that he thought could be relevant. There is nothing improper about this. Mr. Henson's employer had just been sued by two people who had targeted and harassed him. It is not surprising that he would be interested in learning about any potentially helpful relevant cases or law, especially in light of the fact that, as Mr. Henson's email notes, there were "recent cases of LGBT bullying" at Livingston Academy. (Doc. No. 106-6 at PageID# 814). There is likewise

18

nothing in either of these emails to suggest that Mr. Henson and Mr. Melton were trying to "come up with new evidence" or to destroy evidence, as Plaintiffs assert. Mr. Henson's October 30 emails, both to Mr. Melton and himself (Doc. No. 106-6 at PageID# 813), contain brief overviews of school-based First Amendment matters. This was not improper, nor does it substantiate Plaintiffs' brazen assertions that Mr. Melton and Mr. Henson were engaged in any kind of conspiracy or otherwise created or destroyed evidence.

### G. Plaintiffs' Claims Regarding Stephen Henson are Facially False

Plaintiffs also make the demonstrably false claim that Mr. Henson "drummed up some students to submit statements" (Doc. No. 106 at PageID# 669) in the wake of the lawsuit's filing. In support of this offensive claim, Plaintiffs reference emails Mr. Henson exchanged with a student on October 28, 2020. (Doc. No. 106-12 at PageID# 865). Plaintiffs assert that Mr. Henson "solicited students…so he could coach them." (Doc. No. 106 at PageID# 669). First, as a cursory review of this document shows, the student, H.M., sent the initiating email to Mr. Henson referencing the recently filed lawsuit and voicing displeasure with B.A.P.'s shirt. Mr. Henson sent his email only because the student emailed him first.[3] Second, Plaintiffs make the irresponsible inference that Mr. Henson's email response seeking that this student "[c]ome see [him] between classes" is somehow evidence that he then "solicited evidence" from multiple students by "coach[ing]" them on what to say. Not only is this an unreasonable inference to make based on the

---

[3] Plaintiffs assert, per the student's second email, that the student "is not even in school." Of course, in October 2020, OCBOE was following COVID-19 quarantine protocols, including having students refrain from attending school in person for a set number of days if they tested positive or exhibited symptoms. This student might have been attending virtually on October 28 due to the need to quarantine. Clearly, this student did attend classes in person during the fall 2020 semester; the poster the student references in their email was only in Mr. Henson's classroom beginning in the fall of 2020. (Doc. No. 106-12 at PageID# 865; Ex. 1 at p. 14, l. 18 to p. 15, l. 8). This student could not have known about the poster if they had not been present in the building during the fall semester.

content of this email exchange, in his deposition, Mr. Henson was asked, "[d]id you tell [students] they should submit statements to Mr. Melton?" In response, Mr. Henson said, "I—I don't recall. I don't believe so." (Ex. 1 at p. 84, l. 9-11). Mr. Henson further testified, in response to being asked whether he told students to write an e-mail, "I don't believe I told them to write an e-mail, no. I don't think -- I don't remember, but I don't think I told them to write an e-mail to anyone." (*Id*. at p. 55, l. 3-7). Mr. Henson could not even recall telling students to submit statements or emails to Mr. Melton; the claim that he told students to fabricate information, in addition to being reckless, has absolutely no basis in fact.

Even if Mr. Henson had told students to submit statements or emails to Mr. Melton, that is not evidence that he sought students out so that he could use them to fabricate evidence. In his October 20, 2020, summary, dated eight days before the emails he exchanged with student H.M., Mr. Henson wrote, "I have had multiple students come up to me and express how disturbed they were by the content of her shirt and how it made them feel targeted and unsafe." (Ex. 4; Ex. 1 at p. 54, l. 18 to p. 55, l. 2). Further, in an October 27, 2020, email he sent to Mr. Melton, Mr. Henson wrote, "Ms. Woods and I have since had several students approach us and express that they felt targeted…by the shirt." (Ex. 8: 10.27.20 Email from Henson to Melton). It is inarguable that, before Mr. Henson engaged in the student-initiated October 28, 2020, email exchange, students voluntarily approached him and a colleague to express how they felt about B.A.P.'s shirt.

Finally, Plaintiffs claim, "[n]one of the statements from students occurred until after…Henson found out what he needed some witnesses to say." (Doc. No. 106 at PageID# 671). In support of this claim, Plaintiffs rely on Mr. Henson's emails dated October 30, 2020. (Doc. No. 106-6 at PageID# 813, 814). However, two of the three student emails Mr. Melton received are dated October 28, 2020. (Doc. No. 106-4 age PageID# 789, 790). Thus, Plaintiffs' allegations

against Mr. Henson are illogical, irresponsible, and contradicted by evidence Plaintiffs themselves have submitted.

Plaintiffs continue singling Mr. Henson out by alleging that he "pretended like he did not know" about student First Amendment rights. Individual Defendants will first note that, while Plaintiffs copied much of the exchange from this portion of Mr. Henson's deposition, they omitted his counsel's objection. Plaintiffs should have copied the excerpt in its entirety. (Doc. No. 106 at PageID# 673)(Ex. 1 at p. 34, l. 7).

Mr. Henson was deposed on June 13, 2023, thirty-two (32) months after the October 30, 2020, email he sent to Mr. Melton discussing his limited understanding of student speech issues in the school environment. He may not have recalled whatever legal authority he reviewed in October 2020 when he testified in June 2023. Further, Mr. Henson did not, as Plaintiffs assert, "pretend[] like he did not know" about First Amendment rights. Rather, as the excerpted language from his deposition shows, he said, "I'm not a lawyer" and that he did not want to comment on the law. (Doc. No. 106 at PageID# 672-673).[4] At the end of this exchange, Plaintiffs' counsel said, "Okay. Thank you." (Ex. 1 at p. 34, l. 23). Counsel then moved on to a new line of questioning.

Plaintiffs' counsel never objected to any of the testimony Mr. Henson offered in response to her questions or otherwise took any action permitted under *Fed. R. Civ. P.* 30. Counsel did not ask to pause Mr. Henson's deposition to confer with the magistrate judge, which the Practice and Procedure Manual explicitly provides as an option. Plaintiffs took no issue with Mr. Henson's deposition testimony until their August 18 Motion. Plaintiffs have waived any issue they may have

---

[4] Later in his deposition, Mr. Henson affirmed his previously documented statement that he fully supported B.A.P.'s freedom of religion. (Ex. 1 at p. 79, l. 20-25; Ex. 3).

21

had with his testimony. More importantly, there is <u>no evidence</u> that Mr. Henson said or did anything improper.

## H. Application of Rule 37(a)(5)(B) to the Plaintiffs' Motion

Rule 37(a)(5)(B) provides that, if a motion for sanctions is denied, then:

> the court may issue any protective order authorized under Rule 26(c) and must, after giving an opportunity to be heard, require the movant, the attorney filing the motion, or both to pay the party or deponent who opposed the motion its reasonable expenses incurred in opposing the motion, including attorney's fees. But the court must not order this payment if the motion was substantially justified or other circumstances make an award of expenses unjust.

The Individual Defendants respectfully suggest that an award of fees is appropriate in this matter. Plaintiffs have presented to this Court purported legal authority that is misleading. While incorrectly relying upon the State's records retention standards, Exhibit C, is careless, mislabeling a Second Circuit case as a Sixth Circuit case is wrong.

The more egregious offense, however, is accusing the Individual Defendants of destroying some evidence and fabricating other evidence. Plaintiffs have literally no basis in fact for making these accusations and admit as much when arguing, "The <u>possible</u> text messages, email or documentation of the conversation regarding Melton directing Henson to 'send you everything I find out about this' lawsuit is relevant (Exhibit F), because Defendants Melton and Henson are conspiring about what to say to defeat the lawsuit." (Doc. No. 106 at PageID# 669)(emphasis added). There is simply no evidence to support this accusation, and Plaintiffs are themselves well aware of it given the deposition testimony the Plaintiffs have omitted from their Memorandum.

22

## IV. CONCLUSION

As outlined above, Plaintiffs have not submitted evidence sufficient to meet the burden required to demonstrate spoliation or to be awarded any corresponding sanctions or to have any previously dismissed claim reinstated. In support of their claims, Plaintiffs rely almost exclusively upon specious reasoning, unreasonable suppositions, and incomplete references to relevant evidence. Plaintiffs' Motion is not substantially justified.

WHEREFORE, based upon the foregoing, Plaintiffs' Motion should be denied in its entirety.

Respectfully submitted,

**BENNETT & DECAMP, PLLC**

BY:     */s/ Mary C. DeCamp*
          **D. SCOTT BENNETT – TNBPR: 015988**
          **MARY C. DECAMP – TNBPR: 027182**
          *Attorneys for Defendant Richard Melton,*
          *in his individual capacity and Defendant*
          *Stephen Henson, in his individual capacity*
          735 Broad Street
          Suite 214
          Chattanooga, TN  37402
          (423) 498-3789
          dsb@bennettdecamp.com
          mcd@bennettdecamp.com

23

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on **August 29, 2023**, the foregoing **Response of Individual Defendants in Opposition to Plaintiffs' Motion for Sanctions due to Spoliation** has been served via electronic mail through the Court's ECF system to the following:

Kristin Fecteau Mosher, Esq.
**The Law Office of Kristin Fecteau**
5543 Edmonson Pike
Suite 229
Nashville, TN 37211
Telephone: (615) 496-5747
E-mail: kristin@fecteaulaw.com
*Attorney for Plaintiffs*

Frederick H. Nelson, Esq.
David J. Markese, Esq.
**American Liberties Institute**
P. O. Box 547503
Orlando, FL 32854-7503
Telephone: (407) 786-7007
Facsimile: (877) 786-3573
E-mail: rick@ali-usa.org
E-mail: dmarkese@ali-usa.org
*Attorneys for Plaintiffs*

Kenneth S. Williams, Esq.
Mary Dee Allen, Esq.
**Wimberly Lawson**
**Wright Daves & Jones, PLLC**
P.O. Box 655
1420 Neal Street, Suite 201
Cookeville, TN 38503-0655
Telephone (931) 372-9123
kwilliams@wimberlylawson.com
mallen@wimberlylawson.com
*Attorney for Defendant*
*Overton County Board of Education*

BY:     */s/ Mary C. DeCamp*_____
**D. SCOTT BENNETT—TNBPR: 015988**
**MARY C. DECAMP – TNBPR: 027182**